**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION<br>62 Summer Street<br>Boston, Massachusetts 02110<br><br>NATURAL RESOURCES DEFENSE<br>COUNCIL, INC.<br>40 West 20th Street, 11th Floor<br>New York, New York 10011<br><br>R. ZACK KLYVER<br>1 West Street<br>Bar Harbor, Maine 04609<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 N. Main Avenue<br>Tucson, Arizona 85701<br><br>    *Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States<br>1600 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>DOUG BURGUM, in his official capacity as<br>Secretary of the Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240<br><br>HOWARD LUTNICK, in his official capacity as<br>Secretary of the Department of Commerce<br>1401 Constitution Avenue, NW<br>Washington, DC 20230 | Case No. 1:26-cv-1528 |

NEIL JACOBS, in his official capacity as
Administrator of the National Oceanic and
Atmospheric Administration
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230

   *Defendants.*

# COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION

1.      Off the coast of southern New England, three underwater canyons cut into the continental shelf break, rivaling the Grand Canyon in depth. Beyond the canyons lie the only four seamounts—extinct undersea volcanoes—in the U.S. Atlantic waters. These dramatic landforms shape ocean-current patterns that create a three-dimensional biologic hotspot, providing food, shelter, and nursery habitat to an exceptional range of sea life. The area is an important feeding ground for seabirds; endangered sperm, sei, and fin whales; and endangered sea turtles. It is also home to deep-sea corals, which developed over hundreds or thousands of years and form the foundation for complex deep-sea ecosystems, providing habitat and shelter for communities of creatures that live on and around them.

2.      In 2016, recognizing both the scientific importance and the fragility of this area, President Barack Obama designated the area the Northeast Canyons and Seamounts Marine National Monument ("the Monument" or "Northeast Canyons and Seamounts"), pursuant to the Antiquities Act of 1906, 54 U.S.C. § 320301. *See* 81 Fed. Reg. 65161, 65163 (Sep. 15, 2016) ("the 2016 Designating Proclamation").

To protect the extraordinary resources within the Monument, the 2016 Designating Proclamation prohibited commercial extractive activities—including commercial fishing—within its boundaries. *Id.* at 65164-65.

3.     But recent executive action has attempted to strip the Monument of a core protection. This case challenges: (1) President Donald J. Trump's unlawful proclamation of February 6, 2026, which purports to revoke the Monument designation's ban on commercial fishing; and (2) the final rule rescinding the regulation, issued under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), that had prohibited commercial fishing within the Monument. Proclamation No. 11009, 91 Fed. Reg. 6489 (Feb. 6, 2026) ("the 2026 Dismantling Proclamation"); 91 Fed. Reg. 17159 (Apr. 6, 2026) (the "Rescission Rule"). The 2026 Dismantling Proclamation is this President's second attempt to open the Monument to commercial fishing after he attempted to do so during his first term, *see* Proclamation No. 10049, 85 Fed. Reg. 35793 (June 5, 2020) (the "2020 Dismantling Proclamation"), and President Joseph Biden restored protections, *see* Proclamation No. 10287, 86 Fed. Reg. 57349 (Oct. 8, 2021) (the "2021 Restoration Proclamation").

4.     The prohibition on commercial fishing protected the objects of historic and scientific interest within the Monument that the 2016 Designating Proclamation recognized as extremely sensitive to disturbance from extractive activities. Even when otherwise lawful, commercial fishing can harm ocean ecosystems, particularly highly vulnerable ones like those within the Monument.

3

Commercial fishing selectively removes large amounts of marine life, altering the food web. Commercial fishing gear, including heavy crab traps and lobster pots with fixed vertical lines, can capture and entangle marine wildlife—including dolphins, sharks, seabirds, endangered whales, and sea turtles—and harm fragile and slow-growing deep-sea corals. Prohibiting commercial fishing also made the Monument a crucial reference site in the deep sea—unique in the U.S. Atlantic Ocean—where scientists could study marine species and ecosystems undisturbed by destructive commercial extractive activities.

5.    Although the 2026 Dismantling Proclamation cited the Antiquities Act and the U.S. Constitution as the source of President Trump's authority, neither authorizes his proclamation. The Constitution gives Congress, not the President, the exclusive power to regulate U.S. territory and property. In the Antiquities Act, Congress delegates authority to the President to *create* national monuments and *reserve* federally owned or controlled lands and waters to protect objects of scientific or historic interest. It does not give the President the opposite power to *revoke* those protections; Congress retained that latter power for itself. The 2026 Dismantling Proclamation was wholly without statutory or constitutional authority and is therefore unlawful.

6.    On April 6, 2026, the National Marine Fisheries Service (NMFS) published the Rescission Rule. 91 Fed. Reg. at 17159. This final rule rescinded the regulation banning commercial fishing within the Monument boundaries, effective immediately, subjecting the Monument to commercial fishing limited only by

existing regulations and fishery management actions in the region. *Id.* Claiming

that it lacked discretion to consider any other alternatives, NMFS promulgated this

final rule without advance notice to the public, an opportunity for public comment,

or any analysis of environmental impacts under the National Environmental Policy

Act (NEPA). *Id.* at 17159. NMFS also provided no rationale for its rule other than

asserting the 2026 Dismantling Proclamation required it.

7.      But NMFS did have discretion, under the 2026 Dismantling

Proclamation and other applicable laws, to regulate and appropriately manage

commercial fishing in the Monument. NMFS's Rescission Rule improperly relied

upon an unlawful Proclamation, failed to provide any factual support or sound

reasoning for its selected action, violated the procedural requirements of the

Administrative Procedure Act (APA) and Magnuson-Stevens Act, and failed to

comply with the agency's obligations to consider environmental impacts under

NEPA.

8.      The commercial fishing activities permitted by the 2026 Dismantling

Proclamation and the Rescission Rule are incompatible with the proper care and

management of the objects of historic or scientific interest identified in the 2016

Designation and 2021 Restoration Proclamations and protected by the Monument's

reservation. The 2026 Dismantling Proclamation and Rescission Rule deprive the

Monument's historic and scientific objects of core protections, leaving them

vulnerable to the very damage that the Monument reservation was designed to

avoid.

9.     This Court should declare the 2026 Dismantling Proclamation and Rescission Rule unlawful, set aside the Rescission Rule, and enjoin Secretary Burgum, Secretary Lutnick, and Administrator Jacobs (collectively "Agency Defendants") from implementing the 2026 Dismantling Proclamation.

## JURISDICTION AND VENUE

10.     This case arises under the laws of the United States and its Constitution. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331. Additionally, this court has jurisdiction over challenges to the Rescission Rule pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1861(d).

11.     Plaintiffs' claims challenging the Rescission Rule are subject to judicial review pursuant to the APA, 5 U.S.C. §§ 702, 704, 706, and the Magnuson-Stevens Act, 16 U.S.C. § 1855(f).

12.     The Magnuson-Stevens Act provides that regulations issued by the Secretary of Commerce pursuant to that law are subject to review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f)(1). Defendants published the 2026 Dismantling Regulation on April 6, 2026, in the Federal Register. Plaintiffs are filing this Complaint within thirty days of publication of the Final Rule.

13.     The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable relief. Injunctive relief is also authorized by 5 U.S.C. § 706.

14. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

15. Venue is proper in this court pursuant to 28 U.S.C. § 1391(e)(1)(A)-(B) because Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims took place in this judicial district.

## PLAINTIFFS

16. Plaintiff CONSERVATION LAW FOUNDATION (CLF) is a non-profit membership organization dedicated, *inter alia*, to protecting marine wildlife and their habitats as well as other coastal and ocean resources in New England.

17. To further these goals, CLF undertakes litigation and other legal advocacy on behalf of its members' interests; educates its members on conservation issues and on threats, challenges, and solutions for New England's oceans so they can exercise their rights and protect their interests in those resources; promotes public awareness, education, and citizen involvement in the conservation of marine wildlife and resources; and supports programs for the conservation of marine wildlife and their habitats.

18. On behalf of its nearly 7,200 members, CLF has engaged for nearly 40 years in advocacy to protect vulnerable species and ecologically important marine habitat, including the submerged lands and waters east of Georges Bank where the Monument is designated, from all extractive activities. As part of this

7

work, CLF advocated extensively on behalf of its members for the creation of the Monument.

19.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC. (NRDC) is a non-profit environmental membership organization with hundreds of thousands of members nationwide, including tens of thousands of members in states along the northeastern Atlantic seaboard. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends.

20.     For more than three decades, NRDC has advocated for the protection and long-term sustainability of ocean resources on behalf of its members. A central part of NRDC's mission is to protect the nation's seas from harmful exploitation and to conserve the oceans' living resources.

21.     NRDC has long worked to prevent and combat damage from extractive activities, including harmful commercial fishing practices, in and around the Monument and elsewhere in the Atlantic Ocean. NRDC advocated for the creation and ongoing protection of the Monument on behalf of its members.

22.     For 30 years, Plaintiff R. ZACK KLYVER was the Lead Naturalist for Bar Harbor Whale Watch Company, located in Bar Harbor, Maine. Since April 2019, he has continued to work on a part-time basis as a naturalist for Bar Harbor Whale Watch Company, leading trips to observe whales and other marine life several times per week throughout the summer and fall tourist seasons.

23.    In 2019, he co-founded Blue Planet Strategies, LLC, a consulting firm that uses science and law to helps its clients solve ocean conservation problems around the world. He directed science for the firm until 2023.

24.    Presently, Mr. Klyver works as a marine mammal consultant with a number of organizations, including as the marine mammal advisor to Blue Green Future. Mr. Klyver also owns his own international ecotourism company called Flukes, Inc., that specializes in taking clients to see whales around the world. He is also the vice-chair of the Atlantic Herring Advisory Panel for the New England Fishery Management Council.

25.    Mr. Klyver has guided over 3,000 trips and taken over 600,000 passengers to see and learn about the whales, seabirds, and other marine wildlife of the northwest Atlantic Ocean. The Monument's protections benefitted Mr. Klyver by reducing harms to, and facilitating scientific research on, species and ecosystems in these areas. He is currently working with a team planning research trips to the Monument, and his ecotourism company Flukes, Inc. is planning an August 2026 tour to the Monument.

26.    Mr. Klyver actively supported the creation of the Monument, including by speaking at a public hearing in Providence, Rhode Island, in September 2015, as well as at other public educational events.

27.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit environmental organization whose primary mission is to ensure the long-term

9

health and viability of animal and plant communities around the world and to protect both the natural world and humans from environmental harms.

28.     Center for Biological Diversity has devoted considerable resources to ensuring the conservation and sound management of numerous marine species threatened by destructive activities in our oceans, including unsustainable fishing practices.

29.     Plaintiffs and their members benefited from the Monument's closure to commercial fishing. Thus, as described in greater detail below, they would benefit from an order declaring the 2026 Dismantling Proclamation and Rescission Rule unlawful, vacating the Rescission Rule, and enjoining the Agency Defendants from implementing the Proclamation.

## DEFENDANTS

30.     Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States.

31.     President Trump resides and conducts his duties in Washington, D.C.

32.     Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior of the United States.

33.     Secretary Burgum is responsible for ensuring that the Department of the Interior and its constituent agencies, including the U.S. Fish and Wildlife Service, comply with the applicable law, including the 2016 and 2021 Proclamations' directives and requirements for managing the Monument.

10

34.     The Secretary of the Interior resides and conducts his duties in Washington, D.C.

35.     Defendant HOWARD LUTNICK is sued in his official capacity as the Secretary of Commerce of the United States.

36.     Secretary Lutnick is responsible for ensuring that the Department of Commerce and its constituent agencies, including the National Oceanic and Atmospheric Administration (NOAA) and NMFS, an office within NOAA, comply with the applicable law, including the 2016 and 2021 Proclamations' directives and requirements under the APA, NEPA, and the Magnuson-Stevens Act.

37.     The Secretary of Commerce resides and conducts his duties in Washington, D.C.

38.     Defendant DR. NEIL JACOBS is sued in his official capacity as the Administrator of NOAA within the U.S. Department of Commerce.

39.     The Administrator of NOAA is responsible for ensuring that NOAA and its subcomponents, including NMFS, comply with the applicable law, including the 2016 and 2021 Designating Proclamations' directives and requirements ,under the APA, NEPA, and the Magnuson-Stevens Act.

40.     The Administrator of NOAA resides and conducts his duties in Washington, D.C.

41.     The above-named Defendants have the authority, ability, and obligation to remedy the harms to Plaintiffs' interests.

11

## LEGAL BACKGROUND

### I.   The Antiquities Act

42.   The Constitution vests Congress with exclusive power over federal territory and property and foreign and interstate commerce. U.S. Const. art. IV, § 3, cl. 2; *id.* art. I, § 8, cl. 3.

43.   In 1906, Congress enacted the Antiquities Act, delegating some of its authority over federal territory by authorizing the President to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and to "reserve parcels of land as a part of the national monuments" that constitute the smallest area "compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(a), (b). The Act gave the President authority to protect objects of historic or scientific value *in situ* in recognition that individual resources may be "of comparatively little value when scattered about either in museums or private collections." H.R. Rep. No. 59-2224, at 3 (1906).

44.   Exercising Congress's delegation of authority in the Antiquities Act, presidents have declared and reserved national monuments as varied as the Statue of Liberty in New York, Buck Island Reef National Monument in the U.S. Virgin Islands, and the Grand Canyon in Arizona. Depending on the nature and location of the objects to be protected, national monument designations have ranged from just a few acres to millions of acres.

45.    A President's national monument designation confers protection on the identified "objects of historic or scientific interest" and on the area reserved as part of the monument. 54 U.S.C. § 320301(a), (b). In a national monument, protection of the objects of historic or scientific interest is the paramount purpose for which the area is to be managed.

46.    When designating a national monument, the President may "reserve" federally owned or controlled lands and waters as part of the monument, 54 U.S.C. § 320301(b), and as part of that reservation may impose specific use restrictions that are necessary for the "proper care and management of the objects to be protected," *id.*

47.    National monuments have a long history of contributing to our understanding of natural history and science. Soon after enactment, presidents used their powers under the Act to declare land formations and habitats as national monuments so that they could be studied. *See, e.g.*, Proclamation No. 1733, 43 Stat. 1988 (1925) (Glacier Bay National Monument "presents a unique opportunity for the scientific study of glacial behavior and of resulting movements and development of flora and fauna" as well as "relics of ancient interglacial forests"); Proclamation No. 753, 35 Stat. 2131 (1907) (Cinder Cone National Monument "illustrat[es] . . . volcanic activity which [is] of special importance in tracing the history of the volcanic phenomena of that vicinity").

48.    To protect objects of historic or scientific interest, presidents' monument proclamations have frequently withdrawn monuments from the

operation of mineral disposition and leasing laws. Presidents have also prohibited other extractive activities in monuments that would threaten the objects of interest, such as prohibiting commercial fishing in the Papahānaumokuākea Marine National Monument in the Pacific Ocean, Proclamation No. 8031, 71 Fed. Reg. 36443, 36446-47 (June 15, 2006), and banning timber harvesting to protect the "primeval" forests in Muir Woods National Monument in California, Proclamation No. 793, 35 Stat. 2174 (1908).

49.    When such use restrictions are imposed in a President's designating proclamation, they are part of the monument reservation and have the force of law.

50.    The Antiquities Act does not authorize presidents to dismantle previously designated national monuments, either completely or by removing protections that were part of the original reservation. Congress retains that power.

## II.    The Administrative Procedure Act (APA)

51.    The APA, 5 U.S.C. §§ 551-59, 701-06, sets forth the procedures by which federal agencies are accountable to the public and their actions are subject to judicial review.

52.    Among other things, the APA defines the procedures that agencies must follow for "rule making," defined as the process of "formulating, amending, or repealing a rule." *Id.* § 551(5). "Rule," in turn, is defined broadly to include "an agency statement of general or particular applicability and future effect [that is] designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

53.    Section 4 of the APA, *id.* § 553, prescribes a three-step procedure for what is known as "notice-and-comment rulemaking." First, the agency must issue a

"notice of proposed rule making," ordinarily by publication in the Federal Register. *Id.* § 553(b). Second, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." *Id.*

54.    An agency action that meets the definition of a rule must go through notice-and-comment rulemaking subject to two exceptions. Unless another statute states otherwise, the notice-and-comment requirement "does not apply" (1) to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice"; or (2) "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(A)-(B).

55.    The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

56.    The APA confers a right of action on any person adversely affected or aggrieved by a final agency action or failure to act. *Id.* § 702. The Act waives the federal government's sovereign immunity for such claims. *Id.*

57.    Under the APA, a reviewing court has the authority to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" "in

15

excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" and "without observance of procedure required by law." *Id.* § 706(2)(A)-(D).

### III.   The Magnuson-Stevens Act

58.   The Magnuson-Stevens Act, 16 U.S.C. §§ 1801 *et seq.*, sets the default regime for commercial fishing in U.S. waters, including the Exclusive Economic Zone, from 3 to 200 nautical miles from the coast.

59.   The Magnuson-Stevens Act directs regional fishery management councils to prepare fishery management plans. *Id.* § 1852(h)(1). All fishery management plans or plan amendments must be approved, disapproved, or partially approved by the Secretary of Commerce. *Id.* § 1854(3). The Secretary of Commerce has authority to issue regulations implementing the fishery management plans or plan amendments or which may be necessary to carry out any other provision of the Act, subject to the procedural requirements of the APA. *Id.* §§ 1854(b), 1855(d).

60.   The Magnuson-Stevens Act requires NMFS to balance different interests in its management decisions. *See id.* § 1851(a).

61.   The Magnuson-Stevens Act and APA mandate notice-and-comment rulemaking before NMFS may adopt any fishery management plan, plan amendment, or regulation. *Id.* §§ 1854(a)-(c), 1855(d); 5 U.S.C. § 553.

### IV.   The National Environmental Policy Act (NEPA)

62.   Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health

and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. Congress affirmed "the continuing responsibility of the Federal Government to use all practicable means" to, among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "preserve important historic, cultural, and natural aspects of our national heritage." *Id.* § 4331(b)(1), (4).

63.    To accomplish Congress's goals, NEPA generally requires every federal agency, including NMFS, to consider fully and disclose in a "detailed statement," known as an environmental impact statement (EIS), the environmental consequences of and potential alternatives to any major federal action significantly affecting the quality of the human environment, prior to issuing a final decision. *Id.* § 4332(2)(C). An agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in [its] environmental document," *id.* § 4332(2)(D), and must "make use of reliable data and resources," *id.* § 4332(2)(E).

64.    NEPA requires federal agencies, including NOAA, and its sub-agency NMFS, to "identify the reasonable alternatives to the contemplated action and look hard at the environmental effects of its decision" before taking action. *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014) (cleaned up).

65.    The agency must make the EIS available to the public and provide an opportunity for public comment. 42 U.S.C. § 4332(2)(C); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

17

66.    Agencies often use an environmental assessment (EA) to determine if an EIS is required or to analyze agency actions that do not significantly affect the quality of the human environment. If the EA concludes that no EIS is required, agencies issue a "Finding of No Significant Impact" (FONSI) to document their determination.

67.    According to NOAA's Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities, Companion Manual for NOAA Administrative Order 216-6A, at 10 (June 30, 2025) (hereinafter, "the NOAA Companion Manual"), "NOAA shall prepare an EA with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown, unless the agency finds that the proposed agency action is excluded pursuant to [a categorical exclusion]."

68.    The NOAA Companion Manual states that "[a] decision maker must prepare a FONSI if they determine, based on the EA, not to prepare an EIS because the proposed activity or decision will not have significant effects." *Id*. at 12.

69.    The NOAA Companion Manual requires the agency to "publish the EA and FONSI on a public website, such as on the NOAA NEPA website." *Id*.

70.    When courts review an agency's determination not to complete an EIS, they consider whether the agency has (1) "accurately identified the relevant environmental concern," (2) taken the required "hard look at the problem," and (3) made "a convincing case for its finding" that the action does not significantly affect

18

the quality of the human environment. *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340-41 (D.C. Cir. 2002) (quoting *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985)). NEPA compliance is reviewed in accordance with the APA's judicial review provisions.

## FACTUAL BACKGROUND

### I.    The undisputed value of the Northeast Canyons and Seamounts Monument's objects of historic or scientific interest

71.    The Northeast Canyons and Seamounts Marine National Monument encompasses a cluster of four extinct undersea volcanoes (named Bear, Physalia, Retriever, and Mytilus) and three large undersea canyons (Oceanographer, Lydonia, and Gilbert) that cut into the continental shelf about 130 miles off the coast of Cape Cod, Massachusetts. "Together, the monument's submarine canyons and seamounts create the unique ecological conditions necessary to support one of the Atlantic Ocean's most biologically productive and important marine environments and one of science's greatest oceanic laboratories." 86 Fed. Reg. at 57349.



*Fig. 1:* Map of Northeast Canyons and Seamounts Marine National Monument
*Credit: NOAA*

72.    The dramatic and varied terrain of these canyons and seamounts, upwellings and other complex current patterns, and the wide range of marine habitats at different depths combine to create three-dimensional biological hotspots that offer food, shelter, and nursery habitats to exceptionally diverse and abundant sea life.

73.    The canyons and seamounts area has attracted intense scientific interest, particularly over the last decade and a half as deep-sea exploration technologies have advanced. With every exploration of the Monument area, scientists make new discoveries.

20

74.    To date, for example, scientists have found at least 58 different species of deep-sea corals living within the Monument, including several newly discovered species. Corals found at these depths (starting at 50 meters and reaching 4,000 meters below sea level) grow exceptionally slowly—often just millimeters per year, sometimes over the course of hundreds or even thousands of years—and they host complex communities of creatures living on and around them, including many species of fish and invertebrates.



*Fig. 2: Paramuriceid seafan (octocoral) in Oceanographer Canyon*
*Credit: NOAA, Northeast U.S. Canyons Expedition 2013*



*Fig. 3:* Colony of bamboo coral with crinoids on Mytilus Seamount
*Credit: NOAA, Northeast U.S. Canyons Expedition 2013*

21

75.    From the ocean floor to the ocean surface, along the flanks and crowns of the seamounts, and from the continental rise to the shelf around the canyon heads, the Monument's varied terrain supports rare and unusual lifeforms and important ecological relationships. Complex interactions occur between and across the different benthic (seafloor) and pelagic (water column) environments. For example, powerful currents created by the steep walls and slopes of the canyons and seamounts lift nutrients upward towards the surface. Such nutrient upwellings fuel the growth of plankton, the base of the food chain, which attract schools of small fish and the larger animals that, in turn, prey on them.

76.    These biological and oceanographic dynamics make the canyons and seamounts area an important feeding ground for numerous species, including seabirds such as puffins, gulls, shearwaters, storm petrels, gannets, skuas, and terns; large predatory fish such as tunas and sharks; and multiple species of whales, dolphins, and sea turtles, some of which are endangered (such as sperm, sei, and fin whales; and leatherback sea turtles).

77.    For example, the canyons and seamounts area is the critical winter feeding ground for Maine's breeding population of Atlantic puffins, a population that nearly went extinct in the United States in the 1970s. No one knew where these birds spent their winter months until 2015 when, using geolocation devices, scientists discovered that the birds spend several months each winter at sea, in and around the Monument, because of food abundance. Another recent tracking study

shows that endangered black-capped petrels use the Monument, traveling from their nesting grounds in the Caribbean.



*Fig. 4: Atlantic puffin*
*Credit: Project Puffin/Stephen W. Kress*

78.     A peer-reviewed published study found that the Canyons Unit of the Monument contains higher marine mammal species diversity than virtually any (>98% of other areas) other comparably sized area on the Atlantic seaboard and generally protects a diverse and unique marine mammal community.

79.     The Monument also tells the history of the planet. Parts of the Monument were above sea level during the last ice age due to much of the current ocean being frozen in glaciers, as evidenced by woolly mammoth bones found on its seamounts.

## II.    Legal efforts to protect the objects of historic and scientific interest within the Monument

### A.    2015-2016: National Monument designation

80.    In 2015, several Plaintiffs and other stakeholders began calling for full and permanent protection of the canyons and seamounts area.

81.    There was broad support for the Monument in the region, including from scientists, members of the public, coastal businesses, recreational fishermen, religious leaders, state and local political officials, the region's two leading aquaria, regional and local conservation organizations, and others. The Connecticut congressional delegation submitted to the Obama Administration a formal proposal for designation of the Monument that encompassed five major canyons and the four seamounts.

82.    Following a public meeting, several rounds of regional stakeholder meetings, and a public comment period that was open for more than a year, President Obama issued the 2016 Proclamation establishing the Northeast Canyons and Seamounts Marine National Monument. 81 Fed. Reg. at 65161.

83.    The Monument is composed of two units covering roughly 4,900 square miles total, and it is located entirely within the U.S. Exclusive Economic Zone of the Atlantic Ocean. It is the only marine national monument in the U.S. Atlantic Ocean.

84.    The Canyons Unit covers approximately 940 square miles and includes three major underwater canyons, which are outstanding examples of these ecologically rich ocean features. The Seamounts Unit encompasses roughly 3,900

square miles and includes four seamounts—the only seamounts found in the U.S. Atlantic.

85.    Between the Canyons Unit and the Seamounts Unit is a transit corridor for commercial fishing vessels along the continental shelf break.

86.    The 2016 Designating Proclamation identified "the canyons and seamounts themselves, and the natural resources and ecosystems in and around them," as "objects of historic and scientific interest" to be protected under the Antiquities Act, and it reserved the Monument's submerged lands and waters "for the care and management of the objects of historic and scientific interest therein." The 2016 Designating Proclamation provided that the Monument's boundaries were drawn to encompass the smallest area compatible with the proper care and management of the objects to be protected.

87.    The 2016 Designating Proclamation directed the Secretary of Commerce (through NOAA) and the Secretary of the Interior (through the U.S. Fish and Wildlife Service) to share management responsibility for the Monument pursuant to their applicable legal authorities.

88.    The 2016 Designating Proclamation directed that the Secretaries "shall prohibit" certain destructive activities and uses in the Monument—including oil and gas leasing and "[f]ishing commercially"—to ensure the proper care and management of the Monument's objects of interest.

89.    The 2016 Designating Proclamation's commercial fishing prohibition for most fisheries took effect within 60 days of the 2016 Proclamation's issuance.

25

The Proclamation provided for a more gradual phase-in of the prohibition for existing American lobster and red crab permit-holders, specifying that "[a]fter 7 years, red crab and American lobster commercial fishing is prohibited in the monument."

### B.    2017-2020: Threats to the Monument

90.    In March 2017, five fishing industry groups filed a lawsuit in this Court challenging the 2016 Designating Proclamation. They claimed, *inter alia*, that the Antiquities Act did not apply in the ocean and that the Monument was too large.

91.    CLF, NRDC, Mr. Klyver, and the Center for Biological Diversity—all Plaintiffs here—intervened in that litigation to help defend the Monument.

92.    In April 2017, President Trump issued two executive orders directing the Secretaries of the Interior and Commerce to review certain national monuments, including the Northeast Canyons and Seamounts Marine National Monument. Exec. Order No. 13792, 82 Fed. Reg. 20429 (Apr. 26, 2017); Exec. Order No. 13795, 82 Fed. Reg. 20815 (Apr. 28, 2017).

93.    Public comments submitted during the agencies' reviews were overwhelmingly supportive of national monuments in general, and of the Northeast Canyons and Seamounts Marine National Monument in particular.

94.    According to press reports, in 2017, Interior official Randy Bowman emailed a memorandum to other Interior officials outlining a proposal to revoke protections from Northeast Canyons and Seamounts, with the following caveat: "In my initial draft of this memo, which was (by direction) for revoking the designation

rather than just removing the fishing restrictions, I did not even mention [economic] impacts to fishermen, as I felt they were so minor in the context of the overall New England fishing industry as to undercut the case for making changes [to the Monument]."

95.    Despite the agencies' review, the Northeast Canyons and Seamounts remained protected from 2017 through 2020, and the industry groups' legal challenge progressed. On a motion to dismiss, this Court held that President Obama's designation of the Monument was a valid exercise of his Antiquities Act authority. *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48 (D.D.C. 2018). The D.C. Circuit affirmed. *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 979 (2021).

96.    On June 5, 2020, President Trump issued a proclamation purporting to "amend[]" the 2016 Designating Proclamation by revoking its prohibition against commercial fishing in the Monument. 85 Fed. Reg. at 35793.

97.    Plaintiffs filed a lawsuit challenging the 2020 Dismantling Proclamation on June 17, 2020. *See* Compl., *Conservation L. Found. v. Trump*, No. 1:20-cv-01589 (D.D.C. filed June 17, 2020), Dkt. No. 1.

**C.    2021-2025: Restoration and enhanced protections**

98.    In 2021, President Biden took office and issued an executive order initiating a review of the prior administration's rollbacks of national monuments, including Northeast Canyons and Seamounts. Exec. Order No. 13990, 86 Fed. Reg. 7037, 7039 (Jan. 20, 2021). In October 2021, the President reinstated the ban on commercial fishing within the Monument. 86 Fed. Reg. at 57352. As a result,

Plaintiffs voluntarily dismissed their lawsuit in this Court challenging the 2020 Dismantling Proclamation. Notice of Voluntary Dismissal, *Conservation L. Found.*, No. 20-cv-01589 (D.D.C. filed Nov. 10, 2021), Dkt. No. 36.

99.     In November 2022, NMFS held a public hearing and published a notice seeking comments ahead of drafting an action to implement the 2016 Designating and 2021 Restoration Proclamations. 87 Fed. Reg. 67677 (Nov. 9, 2022).

100.    In October 2023, NMFS published a proposed rule and requested public comment on its proposal to incorporate the Monument and the commercial fishing prohibition into existing fishing regulations. 88 Fed. Reg. 72038 (Oct. 19, 2023).

101.    On February 16, 2024, NMFS issued its final rule codifying the commercial fishing prohibition found in the 2016 and 2021 Proclamations. 89 Fed. Reg. 12282 (Feb. 16, 2024) (the "Prohibition Rule"). During the public comment period, Plaintiffs, members of the public, and others expressed support for the Monument's protection. *See, e.g.*, *id.* at 12283.

102.    On June 4, 2024, USFWS and NOAA issued the final monument management plan and environmental assessment. The 2022-2023 public meetings and comment periods on this plan similarly reflected extensive public support for comprehensive protections. *See, e.g.*, Summary of Public Comments Submitted to FWS & NOAA regarding the NECSM draft Monument Management Plan and Environmental Assessment, No. FWS-R5-NWRS-2023-0154, https://www.regulations.gov/document/FWS-R5-NWRS-2023-0154-0001/comment.

The management plan includes provisions for species monitoring and additional scientific study.

103.    In April 2024, two individuals filed a challenge to the Monument's redesignation, as well as NMFS's new regulation. *See* Compl., *Green v. Biden*, No. 2:24-cv-1975 (E.D.N.Y. filed Mar. 18, 2024), Dkt. No. 1. Plaintiffs intervened in the case, which is currently stayed. Order, *Green v. Biden*, No. 2:24-cv-1975 (E.D.N.Y. Mar. 13, 2026).

### D.    2026-Present: Second dismantling

104.    On April 17, 2025, President Trump issued Executive Order 14,276, which, among other actions, directed the Secretary of Commerce, in consultation with the Secretary of the Interior, to "review all existing marine national monuments and provide recommendations to the President of any that should be opened to commercial fishing" within 180 days. Exec. Order No. 14276, 90 Fed. Reg. 16993, 16995 (Apr. 17, 2025).

105.    On August 27, 2025, NMFS invited public comments "on suggestions to improve fisheries management and science within the requirements of applicable laws" in accordance with Executive Order 14,276. 90 Fed. Reg. 41818 (Aug. 27, 2025). Although the notice named several specific sections in Executive Order 14,276 on which it sought comment, the notice did not mention marine national monuments or reference the section of the Executive Order directing the Secretary of Commerce to "review all existing marine national monuments and provide recommendations to the President of any that should be opened to commercial

fishing." *Compare id.* at 41818-19, *with* Exec. Order No. 14276, § 4(h), 90 Fed. Reg. at 16994.

106.    Despite requests from Plaintiffs and others, the Department of Commerce did not request public comments on the possibility of lifting the commercial fishing ban within the Monument. Nonetheless, Plaintiffs and other groups submitted information in support of maintaining protections for the Monument as part of the public comment process for fisheries management and science improvements.

107.    In their comments, Plaintiffs articulated that (1) the commercial fishing prohibition is necessary for the proper care and management of the Monument's objects; (2) protection of the Monument from commercial fishing impacts has not harmed the American seafood industry; (3) the President lacks the legal authority to revoke or modify the Monument's use restrictions or boundaries; and (4) notice-and-comment rulemaking would be required to revoke the regulation prohibiting commercial fishing in the Monument.

108.    On February 6, 2026, President Trump issued the 2026 Dismantling Proclamation. 91 Fed. Reg. at 6489. The 2026 Dismantling Proclamation found that "removing the restriction on commercial fishing . . . to allow for well-regulated commercial fishing use, in accordance with and pursuant to existing statutory authorities, is in the public interest" and "that appropriately managed commercial fishing would not put the objects of historic and scientific interest that the monument protects at risk." *Id.* The Proclamation listed ten statutes, aside from the

30

Antiquities Act, that govern the agency's management actions and the protection of plant and animal resources in the Monument. *Id.* at 6489-90. Any reports or recommendations that the Secretaries of Commerce or the Interior made to the President have not been made public.

109.    The 2026 Dismantling Proclamation purported to revoke the 2021 Restoration Proclamation and reinstate the 2020 Dismantling Proclamation from President Trump's first term. *Id.* at 6490.

110.    No other President in the Antiquities Act's 120-year history has revoked protections from commercial use for all of the objects within an entire national monument, as President Trump purported to do in 2021 and again here. The commercial fishing prohibition is fundamental to the proper care and management of the Monument objects identified in the 2016 and 2021 Proclamations.

111.    The President has no constitutional or statutory authority to dismantle a national monument reservation in this manner. The President lacks authority to do piecemeal what he lacks authority to do outright. Otherwise, the President could peel away the protections provided by a national monument one-by-one until nothing was left.

112.    The 2026 Dismantling Proclamation did not mention NMFS's existing regulations prohibiting commercial fishing in the Monument.

113.    On April 6, 2026, NMFS issued the Rescission Rule, which rescinded the regulation banning commercial fishing in the Monument. 91 Fed. Reg. at 17159.

The Rescission Rule purported to "merely conform[] U.S. fishing regulations to the requirements of the Antiquities Act and [the 2026 Dismantling Proclamation]." *Id.*

114.    NMFS did not release a proposed rule or advanced notice of proposed rulemaking before issuing the Rescission Rule. The Rescission Rule stated that it was effective April 3, 2026, three days before its publication in the Federal Register.

115.    NMFS did not solicit public comment on the legality or impacts of rescinding the commercial fishing prohibition in the Monument.

116.    In the Rescission Rule, NFMS claimed there was "good cause" to waive notice and comment on its action. 91 Fed. Reg. 17159 (citing 5 U.S.C. §§ 553(b)(B) and 553(d)(3)).

117.    NMFS stated that because the Rescission Rule was issued only to "conform to the [2026 Dismantling] Proclamation," the rule was "not discretionary, making the opportunity for prior public comment unnecessary because NMFS has no ability for public comment to inform decision-making." 91 Fed. Reg. 17159.

118.    Nowhere in the Rescission Rule did NMFS discuss how it would ensure that commercial fishing was "appropriately managed," so as to "not put the objects of historic and scientific interest that the monument protects at risk." *See* 2026 Dismantling Proclamation, 91 Fed. Reg. at 6489. Nor did NMFS address compliance with any other environmental or land management statute, despite the 2026 Dismantling Proclamation clearly stating that the agency's management of the Monument was "subject to" a variety of protections from at least ten other laws. *See id.* Instead, the Rescission Rule merely rescinded the regulations at 50 C.F.R.

§ 600.725(x) without mentioning what management measures would govern the Monument area or discussing whether those measures were appropriate and consistent with all applicable laws.

119. NMFS did not engage in any NEPA analysis in connection with the Rescission Rule. NMFS asserted that NEPA "does not apply to this action" because the agency "has no discretion." 91 Fed. Reg. at 17160-61. NMFS did not address whether the Rescission Rule was a major Federal action that may significantly affect the quality of the human environment.

## III.  Commercial fishing harms the objects of historic and scientific interest in the Monument

### A.  The threats commercial fishing poses to the Monument

120. The Monument's objects of historic and scientific interest are acutely vulnerable to damage caused by commercial fishing. Commercial fishing gear historically used in this area have included bottom and midwater trawls (e.g., for mackerel, squid, and butterfish), traps and pots (e.g., for lobster and crab), and pelagic longlines (e.g., for tuna, swordfish, and billfish).





*Fig. 5: Fishing gear types, clockwise from top left: (1) bottom trawl, (2) traps and pots, (3) pelagic longline, (4) midwater trawl*
*Credit: NMFS, "Bycatch: Fishing Gear and Risks to Protected Species," at* *https://perma.cc/VVH7-UMSE; https://perma.cc/73RP-GGTS; https://perma.cc/E5W6-5C9G; https://perma.cc/NF3C-2BPC; https://perma.cc/7VML-QLJU; https://perma.cc/UUP6-CDZP.*

121. One pass of a large, weighted bottom trawl net can destroy corals, sponges, and anemones. Such gear poses a particular threat to deep-sea corals that have been growing for hundreds or even thousands of years. Deep-sea organisms, like corals, tend to have longer lifespans and slower growth rates than their shallow-water counterparts, making it difficult for them to recover from even a single disturbance.

122. Commercial fishing's damage to the seafloor has broader repercussions. Benthic fauna—including deep-sea corals, sponges, and anemones—create the foundation for the deep-sea ecosystem, providing food, spawning habitat, and shelter for an array of fish and invertebrate species. Bottom trawl nets can

prevent the growth of new colonies. Other fishing gear types that contact the sea floor, such as heavy offshore lobster and crab traps and pots, are also known to impair and destroy these habitats. Further, trawls, traps, and pots can degrade bottom sediments and important habitat structure, like cobble, and harm organisms that live in these habitats.

123.    The heavy traps and pots used in offshore commercial fishing cause damage throughout the water column as well. For example, vertical lines connecting traps and pots to buoys at the surface are known to entangle whales, often fatally, as well as sea turtles such as the endangered leatherback.

124.    Higher in the water column, commercial fishing removes large schools of fish and squid. Animals further up the food chain—like certain marine mammals, sharks, and sea birds—rely on both for survival.

125.    Commercial fishing gears also inadvertently catch, injure, and kill non-targeted species—a phenomenon called "bycatch."

126.    For example, pelagic longlines—which can stretch thirty miles long, with thousands of baited hooks that are intended to catch large fish such as swordfish and tuna—catch other marine wildlife such as whales, dolphins, seabirds, sea turtles, and non-targeted sharks and other fish. Even with gear modifications, it is not possible to eliminate all potential bycatch.

127.    Commercial fishing gear is frequently lost or abandoned in the ocean, causing bycatch and entanglement in so-called "ghost gear."

128. Commercial fishing also brings with it increases in vessel traffic, resulting in noise pollution for species within the Monument.

129. Scientific evidence demonstrates that quiet ocean areas can act as acoustic refugia for certain species because they support vital biological functions. For example, in Cape Cod Bay, these opportunity areas have been shown to improve whale health and behavior (increased socializing and mating) otherwise disrupted by vessel traffic noise. And in the Bay of Fundy, after September 11, 2001, when shipping nearly ceased, a study demonstrated a decrease in faecal stress-related hormones (glucocorticoids) in North Atlantic right whales. Animals that use echolocation to find prey also have an easier time foraging without interference.

130. By prohibiting commercial fishing, the 2016 and 2021 Proclamations protected the Monument's ecosystems and species from the harms described above, including destruction and adverse modification of habitat; bycatch of non-target species (including seabirds, turtles, whales, and dolphins); entanglement of marine mammals and other species; disturbance of fish foraging, breeding, nursery functions, and other essential activities; removal of fish prey; and noise pollution—all of which harm the objects of historic or scientific interest within the Monument.

**B.  Prohibiting commercial fishing is important to scientific research in the Monument**

131. Numerous scientific studies have been conducted in the Monument since its designation in 2016.

132. Since November 2017, researchers from the New England Aquarium have conducted twenty-five aerial scientific surveys of the Monument. During these

36

surveys, researchers have observed and documented an extraordinary amount of marine life inside the Monument, including seven species of fish, sharks, and rays; and seventeen species of marine mammals such as different species of dolphins, beaked whales, pilot whales, humpback whales, fin whales, sperm whales, and sei whales. Researchers have observed a broader range of species on each flight than they see elsewhere. For example, seeing beaked or sperm whales on the same flight as fin or humpback whales is unusual because they have different food sources. Other particularly noteworthy observations include the rarely sighted True's beaked whale, whale sharks, two blue whales in two separate years (the largest animal species that has ever existed and one that is rarely spotted in ocean waters near New England), and a high percentage of dolphin and whale mothers accompanied by calves and juveniles.



*Fig. 6: Fin whale swimming inside the Monument*
*Credit: New England Aquarium, November 12, 2017*



*Fig. 7: Sperm whale swimming inside the Monument*
*Credit: New England Aquarium, October 25, 2019*



*Fig. 8: Blue whale swimming inside the Monument*
*Credit: New England Aquarium, February 27, 2026*

133.    During a September 2018 submersible expedition to the Monument, Woods Hole Oceanographic Institution scientists discovered two previously unknown species of deep-sea corals in Lydonia Canyon. The new species are types of "bubblegum corals," so called because they have soft bundles of polyps that resemble wads of bubblegum along their branches.



*Fig. 9: ~100-year old Bubblegum coral (Paragorgia arborea) on Retriever Seamount. Credit: NOAA Ocean Exploration, July 2021, https://perma.cc/5DVZ-KVRP*

134.    NOAA has conducted or participated in at least five scientific expeditions within the Monument since its designation. NOAA broadcast two of these expeditions live to the public. NOAA's expeditions included visiting areas that had not been previously surveyed or explored, including parts of Gilbert Canyon, Oceanographer Canyon, Bear Seamount, and Retriever Seamount. Scientists documented high biomass and high diversity, novel behaviors and ecological interactions, and potentially new species on these trips.



*Fig. 10: Pink Coral on Retriever Seamount Credit: NOAA Ocean Exploration, September 2019*

135.    Researchers have continued to make scientific discoveries in the Monument and publish new findings, such as the discovery of woolly mammoth bones on the surface of a Monument seamount.

136.    In summer 2026, scientists are planning an expedition to visit seamounts and canyons within the Monument to conduct scientific sampling. The scientists plan to use baited remote cameras to observe apex predators, do blue water dives to observe small fishes and their relationship to other fauna (like gelatinous organisms), and conduct split-beam sonar surveys to observe day-night vertical migration of organisms.

137.    The commercial fishing prohibition is a core part of the Monument and its facilitation of research. Studies have found that fish biomass, as well as fish size/age, in marine protected areas can be significantly greater on average than in fished areas. A growing body of empirical evidence suggests that some of this increased biomass can have spillover benefits to adjacent areas as well.

138.    A prohibition on commercial fishing across a large area allows the Monument to serve as a spawning and nursery refuge that, over time, would support higher densities of a range of fish and invertebrate species and would allow scientists to better understand the relationships between fish productivity and fishery disturbances. A commercial fishing prohibition would make the Monument the only deep-sea area in the U.S. Atlantic completely protected from the harms of commercial fishing. It allows the Monument to be a unique place, where marine mammals and other animals can forage, congregate, raise young, and engage in

other essential behaviors free of disturbance and risk of harm, such as entanglement or bycatch, from commercial fishing activities.

139. For the same reason, a commercial fishing prohibition allows the Monument to be a valuable scientific reference site and control area for studying the ecology of offshore areas, and for studying regional changes to marine wildlife and ecological productivity associated with climate change.

140. While prohibiting commercial fishing in a specific area has ecological and scientific benefits, there is no evidence that the commercial fishing prohibition has economically harmed the fisheries that historically operated in the Monument area. According to U.S. government data, average landings (i.e., quantity of fish caught and sold) in the New England and Mid-Atlantic squid, mackerel, and butterfish fisheries *increased* 24 percent in 2017-2024 compared to the previous eight years. (That figure excludes the two years, 2020-2021, when the fishing prohibition was lifted.) Overall revenues increased 52 percent during this same time period (2017-2024). In Rhode Island, which has the ports most proximate to the Monument, landings of squid, mackerel, and butterfish increased 39 percent and revenues increased 66 percent in 2017-2024 (again excluding 2020-2021) as compared to the 2009-2016 time period before the Monument was created.

141. Meanwhile, overall landings of the principal tuna stocks (bigeye, yellowfin, and bluefin) and swordfish in the highly migratory species commercial fishery in the New England and Mid-Atlantic regions did not meaningfully change in 2017-2024 (excluding 2020-2021) compared to 2009-2016. Overall revenues from

41

tuna and swordfish catch in the fishery also remained essentially unchanged during this time. A 2022 peer-reviewed technical journal article similarly found no evidence of negative economic impact on any of these fisheries when examining location of fishing activity and distance traveled to fish.

142. The red crab and lobster fisheries were allowed to continue fishing in the Monument through 2023, pursuant to a seven-year sunset period. Almost all red crab landings between 2015 and 2021 were from outside the Monument. The same was true of the overwhelming proportion of lobster fishing between 2015 and 2022.

## C.     Resumption of commercial fishing in the Monument harms Plaintiffs' interests

143. Plaintiffs and their members plan to continue to view, study, and enjoy the unique habitats, fish, marine mammals, seabirds, corals, and other marine species that are objects of historic or scientific interest protected by the Monument designation and the Prohibition Rule.

144. The prohibition on commercial fishing within the Monument—set by the 2016 Designating Proclamation, 2021 Restoration Proclamation, and Prohibition Rule—benefited Plaintiffs and their members by enabling them to use and enjoy the ecosystems and marine life in and around the Monument area for scientific, educational, aesthetic, and recreational purposes without disturbance or harm from commercial fishing. Resumption of commercial fishing under the current fishery management plans and regulations harms those interests.

145.   Conservation Law Foundation (CLF) has thousands of members that use and enjoy fish and other marine resources off the New England coast for recreational, aesthetic, educational, and scientific purposes.

146.   CLF's members have a particular interest in the protection of ecologically important areas in the ocean off New England, like the Monument, because large marine protected areas increase the ocean's resilience to climate change and serve as scientific reference sites.

147.   CLF's members include professional scientists who have been studying the habitats within, and many of the species associated with, the Monument and nearby areas.

148.   One such CLF member is Peter Auster, Ph.D., a scientist who specializes in marine ecology. He is a Research Professor Emeritus of Marine Sciences at the University of Connecticut, where he has held multiple positions since 1979; and a Scientist in Residence at Mystic Aquarium, where he has worked since 2011. He serves on multiple regional, national, and international committees that advise agencies regarding conservation and management, including as a Member of the New England Fishery Management Council Habitat Plan Development Team, a Technical Advisor to the Advisory Committee for the U.S. Commissioner to the International Commission for the Conservation of Atlantic Tunas (ICCAT), and a Member of the Working Group on Deep-water Ecology (WGDEC) to the International Council for Exploration of the Seas (ICES). He recently was a Member of the NOAA Marine and Coastal Area-based Management

43

Federal Advisory Committee, a Member of the Committee to Review Draft Chapters of the Biodiversity and Climate Change Assessment for the U.S. National Academies of Sciences, Engineering, and Medicine, a Member of the Gray's Reef National Marine Sanctuary Advisory Council, and a Working Group Member on the recent establishment of the Connecticut National Estuarine Research Reserve.

149. For over 40 years, Dr. Auster has conducted studies to define how variation across underwater landscapes mediates the distribution and abundance of fishes as well as associated species (e.g., corals), understand the linkages between habitat-level processes and population-community dynamics, and develop survey methods for animals living in spatially complex habitats. Dr. Auster's focuses have included understanding the ecological impacts of human uses of the sea and on developing a scientific basis for using marine protected areas as a conservation tool.

150. Dr. Auster has extensively studied the canyons and seamounts area that the Monument encompasses. Over the course of multiple research trips spanning the last 40 years, Dr. Auster has led or participated in research expeditions—using a human-occupied vehicle (HOV) or remotely operated vehicle (ROV)—to all three canyons and four seamounts that are within the Monument.

151. Dr. Auster has used multiple submersible vehicles and other ship-based tools to study northeast submarine canyons and seamounts, principally to understand the interactions of species and habitats, the ecological interactions between species, and how diversity is distributed within these precipitous and dynamic landscapes. This work, in collaboration with multiple academic colleagues,

44

has resulted in an improved understanding of the ecological structure, the web of interactions, and the vulnerability of these deep-sea communities.

152.    As part of his work, Dr. Auster has studied the effects of commercial fishing practices on seafloor communities like those in the Monument. Dr. Auster has also studied the effects of opening the Monument to commercial fishing. He has seen first-hand the destruction that bottom trawling and offshore pot and bottom-longline fisheries can cause. Because deep-sea corals can live for hundreds of years, grow slowly, and do not propagate easily, damage caused by commercial fishing could take centuries to recover, if ever. Other taxonomic groups are equally vulnerable, although the current scientific understanding of population processes is more incomplete and will benefit from further research in the Monument. Further, fishing can significantly affect the web of interactions between species. Removing large numbers of fishes from the local environment, including those that serve as prey for apex predators, also can have deleterious effects on Monument resources.

153.    Dr. Auster was part of the dive-planning team for the 2019 NOAA Ship *Okeanos Explorer* cruise to the region, which resulted in four dives to the Monument, including one in the head of Oceanographer Canyon. The results of this dive clarified the need to return to the canyon heads in the Monument to compare and contrast the benthic fauna there with similar communities outside the Monument.

154.    Dr. Auster's ability to compare fished and unfished sites will be eliminated as soon as fishing resumes. Dr. Auster and collaborators are developing

proposals for longitudinal studies that return to a set of sites inside and outside the Monument to study recovery and impacts, with the Monument serving as an unimpacted reference site.

155.    Dr. Auster led the 2024 *R/V Connecticut* Expedition in partnership with U.S. Fish and Wildlife Service, NOAA, Yale University, University of Connecticut, and Mystic Aquarium, which used baited remote underwater video cameras to sample apex predators in surface waters, collected eDNA to assess whole community biodiversity, collected gelatinous organisms that are important predators in plankton, and surveyed seabirds across the Monument.

156.    Dr. Auster plans to visit the Monument again in the summer of 2026 on an expedition with similar objectives.

157.    Opening the Monument to commercial fishing will harm Dr. Auster's research by jeopardizing his and other scientists' ability to conduct longitudinal studies of how an ecosystem functions unimpacted by local disturbances caused by human uses. Opening the Monument also eliminates Dr. Auster's and other scientists' ability to compare and contrast areas closed and open to commercial fishing, such as by contrasting nearby seafloor and midwater communities subject to fishing pressure with those protected inside the Monument.

158.    In addition, the value of Dr. Auster's other research in the Monument, such as scientific studies of ecological interactions between species and diversity distribution, will be reduced depending upon the extent of commercial fishing

ultimately permitted in the Monument. Under current management measures, the value of the Monument as a reference site will be significantly reduced.

159.    Another CLF member is Dr. Rhian Waller, Ph.D., a scientist who specializes in invertebrate reproduction, deep-sea biology, and cold-water corals. Dr. Waller is a Professor at the University of Gothenburg's Tjärnö Marine Laboratory, Sweden, where she has worked since 2022. She has held multiple positions since 2003, including Associate Professor at the School of Marine Sciences with the University of Maine. Dr. Waller serves on numerous national and international committees and currently serves as a member of the editorial board for the Journal on Invertebrate Reproduction & Development and Associate Editor for Frontiers in Marine Science – Deep-Sea Environments and Ecology. At the University of Gothenburg, she is also the Head of Teaching and Learning for the Department of Marine Sciences and sits on the Leadership Committee, Faculty Education Committee and the Institution Committee for the Department of Marine Sciences. She is also a National Geographic Explorer and voted Member of the Explorers Club International. She previously served as the Marine Colloquium Series Co-Organizer (University of Maine) and the School of Marine Sciences (University of Maine) Peer Committee among other committees.

160.    For over 25 years, Dr. Waller has studied the reproduction and development of cold water, deep-sea invertebrates from around the globe, and how these animals are affected by both natural and anthropogenic environmental change. Her current research examines how deep-water corals and sponges survive

47

and thrive to create healthy ecosystems in waters from a few meters depth to over 6000 meters and from the Atlantic, Pacific, and Southern Oceans. Dr. Waller's research relies on direct sampling, submersible observations, and long-term biological datasets to address fundamental questions about reproduction, biodiversity, and growth in vulnerable, cold-water, deep-sea species.

161. Dr. Waller has a long history of conducting research and studying in the canyons and seamounts area that contains the Monument. Over the last couple of decades, Dr. Waller has led or participated in six research expeditions using a HOV or ROV to study deep-sea coral communities on Bear, Physalia, Mytilus, and Retriever Seamounts and in Oceanographer Canyon within the Monument.

162. Dr. Waller started working in the area that is now the Monument as a U.S. Geological Survey postdoctoral scholar at the Woods Hole Oceanographic Institution. From 2003 to 2005, she visited the Northeast Canyons and Seamounts on three research cruises, including via a submersible (HOV and ROV) with the *R/V Atlantis* and the NOAA Ship *Ron Brown*, studying biodiversity and connectivity and helping construct the original database that is now the NOAA Deep Sea Coral Data Portal. Those cruises provided the opportunity to collect corals from different sites for direct comparisons. Dr. Waller also participated in submersible dives to Bear Seamount with the HOV Alvin onboard the *R/V Atlantis,* studying coral biodiversity, connectivity and reproduction. In 2014, Dr. Waller participated remotely from a virtual van (University of Rhode Island) in the NOAA Ocean Exploration Expedition to the Northeast Seamounts and Canyons. In 2021,

48

Dr. Waller served as the Chief Scientist on the research cruise for the NOAA Ocean Exploration with the NOAA Ship *Okeanos Explorer*, which included the shallowest dive to date on a pinnacle on Retriever Seamount and in an area that had not been seen before. The results of that dive uncovered at least 29 species of deep-sea coral, including exceptionally large colonies of black corals and bubblegum corals aged at least 100 years old. She has also observed rich biodiversity, including densely packed deep-sea organisms and areas that are teaming with life. Dr. Waller also continues to collaborate with NOAA colleagues collecting samples from the Monument for continuing reproduction studies of corals in the area.

163.    Dr. Waller is currently studying the reproductive strategies and ecological role of the bubblegum coral *Paragorgia arborea* and the Red Tree Coral *Primnoa reseadiformis*. For over 20 years, her research has relied on samples collected by NOAA within the Monument. Dr. Waller depends on samples from the Monument because the area provides the rare and irreplaceable ability to sample intact deep-sea coral communities accessible for repeated study. To study reproductive processes requires long spatial studies to understand both cause and effect, as well as varied niches and species, and the Monument has provided this study environment.

164.    Dr. Waller plans to continue this research and is actively relying on samples collected within the Monument. For example, she received samples in 2024 from colleagues at NOAA and the Smithsonian Museum of Natural History (collected during a collaborative expedition with Canadian scientists) and will

continue to receive samples from future expeditions for her research. This includes receiving additional samples of deep-sea corals and sponges to continue spatial and temporal studies on reproduction and development and working on ROV videos (already collected and future) for biodiversity analysis.

165.    Dr. Waller's research depends on long-term biological datasets that span long time frames. The thousands- and hundreds-year-old coral colonies that Dr. Waller studies are extremely vulnerable to any disturbance, including from commercial fishing. For example, during her research trips, Dr. Waller has seen firsthand the damage caused by trawling on corals in other areas still visible decades later. She is concerned about similar gear impacts in the Northeast Canyons and Seamounts, which is more accessible to the fisheries, including impacts of lost gear.

166.    Opening up the Monument to commercial fishing threatens the species Dr. Waller studies and will threaten her ability to study these vulnerable deep-sea coral communities. For example, commercial fishing will threaten Dr. Waller's ability to study the reproductive strategies of deep-sea coral species, which requires securing multiple samples over a long time period to study inter-annual variability. It will harm Dr. Waller's research by jeopardizing her ability to conduct longitudinal studies of ecosystems functioning without localized anthropogenic disturbance. It will directly undermine Dr. Waller's ability to conduct this research and potentially leave open the scientific questions that she is seeking to address and currently remain unresolved. It will also eliminate Dr. Waller's ability to rely

on the Monument as a long-term reference site. Disturbance or loss of coral colonies from fishing activity could disrupt sampling continuity and compromise reproductive datasets. Under current conditions, which rescind the commercial fishing ban entirely, the Monument's value as a reference site will be significantly reduced.

167.   The protections in the 2016 and 2021 Proclamations and the Prohibition Rule benefitted CLF's members by protecting the Monument area from disruption and damage caused by commercial fishing; by preserving the health and beauty of the ecosystems for future study and scientific research; and by enabling CLF's members to study, view, and enjoy the Monument as the only large marine protected area off New England's shores.

168.   The Natural Resources Defense Council (NRDC) has members who are scientists, educators, recreational fishermen, and bird- and wildlife-watchers and who use the area in and around the Monument for research, education, wildlife viewing, aesthetic appreciation, and recreation.

169.   One such NRDC member is Dr. Mary Beth Decker, a biological oceanographer and marine ecologist whose research focuses on open-ocean (pelagic) ecosystems, including the distribution and abundance of animals in the pelagic food web. Dr. Decker specializes in gelatinous zooplankton, such as jellyfish and salps, and their interactions with forage fish and higher-level marine predators.

170.   Dr. Decker is a research scientist at Yale University, where she conducts marine science research and teaches undergraduate and graduate-level

courses addressing marine ecosystem function, climate change, and conservation. She also incorporates information about real-world marine protected areas into her teaching and public outreach.

171.    In July 2024, Dr. Decker participated in a scientific research expedition to the Monument. This expedition provided Dr. Decker with her first opportunity to directly observe and conduct research within the Monument following its designation.

172.    While conducting research within the Monument, Dr. Decker observed gelatinous species that she had not encountered elsewhere in the region, including truly open-ocean species such as *Pelagia noctiluca*. These observations confirmed the Monument's unique and relatively undisturbed pelagic ecosystem.

173.    Dr. Decker also observed numerous marine mammals and seabirds within the Monument, including sperm whales, humpback whales, dolphins, and a diversity of seabird species. She observed these animals feeding and foraging in an environment free from the risks associated with commercial fishing gear, including entanglement and bycatch. She derives aesthetic enjoyment from seeing this abundance of species in the wild.

174.    Based on her scientific training and experience, Dr. Decker values the Monument as one of the very few places in the Atlantic Ocean that has been fully protected from commercial fishing and other extractive industrial activities. The Monument provides a rare and irreplaceable scientific baseline for studying pelagic

food-web dynamics, predator-prey relationships, and ecosystem structure in a minimally disturbed setting.

175.   Dr. Decker's research seeks to understand how marine ecosystems are changing over time in response to natural variability and human-induced climate change. Having fully protected reference areas such as the Monument is essential to her ability to distinguish climate-driven changes from changes caused by fishing pressure and other human activities.

176.   Dr. Decker intends to continue conducting and collaborating on scientific research in the Monument, including future expeditions using plankton nets, underwater imaging systems, and environmental DNA sampling. She plans to return to the Monument during the summer of 2026 to collect additional samples and data.

177.   The reopening of the Monument to commercial fishing under current management measures will compromise Dr. Decker's ability to conduct her research by altering food-web structure and diminishing the Monument's value as a scientific reference site. The introduction of fishing pressure risks changing species composition, predator-prey relationships, and ecosystem dynamics before she can complete planned sampling.

178.   The loss of the Monument's protection from commercial fishing will also impair Dr. Decker's ability to rely on the Monument as a long-term baseline for scientific study.

179.    In addition to her research, Dr. Decker relies on the Monument for her teaching and public education efforts, including university courses and public lectures at museums and aquariums in the Northeast. The degradation of the Monument due to resumed commercial fishing under current management measures will directly undermine her ability to educate students and the public about pelagic ecosystems and marine conservation.

180.    The reopening of the Monument to commercial fishing under current management measures also harms Dr. Decker's aesthetic and recreational interests by increasing the risk of entanglement, bycatch, and disruption of natural predator-prey relationships, reducing her ability to observe and experience the Monument's rich marine biodiversity in its natural state.

181.    Another such member of NRDC is Dr. Scott D. Kraus, a marine biologist whose research encompasses the biology and conservation of marine mammals and who studies the conservation benefits of the Monument's designation on marine mammals in that area.

182.    Dr. Kraus has personally flown over the Monument area conducting aerial surveys of marine mammals; from 2017 to 2019 he directed a research team at the New England Aquarium collecting data within the Monument boundaries.

183.    Dr. Kraus has now retired from the New England Aquarium, but he remains affiliated and continues to collaborate with Aquarium researchers. Dr. Kraus also continues to conduct and publish his own research. Among other things, Dr. Kraus is involved in efforts to collect and analyze marine mammal data from

54

areas of the northwestern Atlantic, including the Monument, through the North Atlantic Right Whale Consortium.

184. To inform his research, Dr. Kraus continues to rely on data and imagery gathered from the New England Aquarium's Monument overflights and other surveys.

185. Dr. Kraus intends to return to the Monument on a research vessel to gather data. For his next research visit, he plans to drop camera traps to see what animals are feeding at what water depth within the Monument. He also plans to utilize drones for overflight surveys to monitor animal activity at the Monument surface, to better understand the relationship between the deep-water food chain and megafauna behavior at the Monument's surface. He expects that the research team will spend about two weeks on vessels within the Monument to conduct this survey.

186. Dr. Kraus values the Monument because it is a biological hotspot from the seafloor up to the surface—an amazing area where scientists can observe rarely seen animals, including mixed schools of dolphins and pilot whales, manta rays, and sperm whales. Dr. Kraus has found his expeditions to the Monument thrilling due to the opportunities the Monument presents for rigorous, unique research.

187. Prior to the challenged actions, the Monument's prohibition on commercial fishing made this the only deep-sea area fully protected from commercial fishing in the U.S. Atlantic.

188.    The loss of that protection will compromise Dr. Kraus's ability to assess how the absence of commercial fishing harms—including entanglement in longlines and trap lines, and acoustic disturbances from large vessels' engine noise and depth-sounders—may impact marine mammal distribution, abundance, and behavior in the Monument.

189.    The loss of protection from commercial fishing will also impair Dr. Kraus's ability to use the Monument area as a reference and control site to study regional changes to marine wildlife associated with climate change. The Monument's prohibition on commercial fishing would have allowed Dr. Kraus to study shifts over time in marine mammal populations, distribution, and behavior in response to ecosystem changes, without confounding effects from commercial fishing.

190.    Mr. Zack Klyver regularly uses the waters of the northwest Atlantic Ocean to view, study, and educate others about marine wildlife, including wildlife that use the Monument as habitat and feeding ground, such as humpback, sperm, fin, and sei whales, and many seabirds, including the population of Atlantic puffins that nest in the summer on islands near Bar Harbor and overwinter at sea in the Monument area.

191.    Mr. Klyver has frequently traveled to observe marine wildlife in many different parts of the northwest Atlantic. He has led a whale and seabird boat tour to the nearby Hudson Canyon, and his company Flukes, Inc., is planning a 2026 tour that will take guests to see whales and other marine wildlife in the Monument.

192. The commercial fishing prohibition benefitted Mr. Klyver's interests in viewing, studying, and educating others about these whales, marine wildlife, and seabirds by providing the species with a protected source of food, shelter, and passage for their migrations and movements, reducing the negative effects of commercial fishing, and helping to ensure that they maintain healthy populations year after year.

193. The commercial fishing prohibition also facilitated scientific investigation and therefore provided Mr. Klyver with information to use when educating the public, commenting on agency decisions, and advising agency decision-makers about marine life in the northwest Atlantic Ocean, as he does frequently in his capacity as a naturalist and vice-chair of the Atlantic Herring Advisory Panel for the New England Fishery Management Council.

194. <u>Center for Biological Diversity</u> members and staff use the northwest Atlantic Ocean, including areas within and near the Monument, to view and study marine wildlife, including humpback, right, sperm, fin, and sei whales; loggerhead and leatherback turtles; sharks and other fish; and seabirds.

195. One such member of Center for Biological Diversity is Zack Klyver, who is interested in the Monument and the protections the commercial fishing prohibition provides, and is harmed by the revocation of these protections as described above. Another Center member recreates in and near the Atlantic Ocean off Massachusetts each summer. She regularly swims and sails in the waters off Martha's Vineyard and enjoys visiting Cape Cod for camping and whale watching

trips. While doing so, she looks for and enjoys seeing migratory species like sharks, dolphins, and fin whales that travel to and from the Monument area; as well as gulls and other seabirds and whale species, like humpback whales. She benefits from the Monument's commercial fishing prohibition because it provides important protections to a variety of marine life and helps ensure healthier populations of the sharks, whales, and seabirds she enjoys.

196.    Together, the 2026 Dismantling Proclamation and Rescission Rule strip the Monument of the complete prohibition on commercial fishing that made it an important scientific reference site and refuge. The Rescission Rule results in the Monument fishery being subject to the same statutes, regulations, and fishery management plans that apply outside the Monument, despite the Monument designation still being in place.

197.    The existing regulations and fishery management plans were not promulgated with the protection of the Monument's objects of historic or scientific interest as paramount, as required by the Antiquities Act. *See Mass. Lobstermen's Ass'n*, 349 F. Supp. 3d at 59 (observing that "[t]he Antiquities Act is entirely focused on preservation"). In other words, neither NMFS nor the fishery management councils considered as part of their deliberations the specific question of what restrictions were needed to protect the objects of historic or scientific interest named in the 2016 and 2021 Proclamations.

198.    The existing regulations and fishery management plans do not adequately protect the Monument's objects of historic or scientific interest. For

example, although there are some restrictions on the use of bottom trawling gear to protect deep-sea corals, these restrictions generally do not apply to the red crab fishery, the longline fishery, or depths shallower than 600 meters (and thus do not apply to the lobster fishery and existing bottom trawl fishery, both of which only occur at shallower depths). Put another way, the existing regulations allow the types of fishing that historically occurred in the Monument that pose extant threats to its scientific and historic objects; the same threats that the commercial fishing prohibition in the 2016 and 2021 Proclamations intended to alleviate.

199.    Had NMFS solicited public comment or done NEPA review, Plaintiffs would have objected to NMFS providing no new protections for the objects of historic or scientific interest in the Monument and provided information on why the existing restrictions are inadequate. With the benefit of this information, NMFS may have placed additional limitations on commercial fishing to protect Monument objects. Plaintiffs and their members suffer a procedural injury from NMFS's failure to follow notice and comment requirements or conduct NEPA review, which is tied to their scientific, recreational, aesthetic, and environmental interests.

200.    Opening the Monument to commercial fishing will likely result in increased vessel traffic and noise; bycatch and entanglement of marine mammals and other marine wildlife in fishing gear; disturbance of feeding and foraging seabirds, sea turtles, and marine mammals; damage to fragile and ecologically important deep-sea coral habitat; and deleterious alterations to the area's ecology

59

and ecosystems, including the depletion of forage fish and the extraction of large numbers of other key fish species.

201.    Commercial fishing in the Monument will likely harm endangered, threatened, and vulnerable species like whales, sea turtles, and puffins, by disrupting the areas on which they depend for overwintering, feeding, breeding, and migration, as well as injuring and killing animals directly. These impacts will adversely affect Plaintiffs' and their members' ability to view, study, and enjoy these vulnerable species in a relatively pristine, undisturbed habitat.

202.    Commercial fishing in the Monument will also interfere with scientific investigations of the canyons and seamounts area by harming and potentially extirpating species there that have yet to be identified and investigated.

203.    Rescission of the ban on commercial fishing in the Monument harms researchers' and educators' (including several Plaintiffs' and their members') ability to use the Monument as a control and reference area for longitudinal or comparative studies of the effects of human disturbances on ocean ecosystems. Scientists, including some of Plaintiffs' members, plan to use the Monument as a unique control area that would help them study the impacts of commercial fishing on similar areas in the northwest Atlantic Ocean. They also plan to use the Monument to analyze the ecological and other benefits associated with landscape-scale closed marine areas. Some of these scientific investigations will no longer be possible or will be harmed because of the resumption of commercial fishing.

204. These harms from the lifting of the commercial fishing prohibition are likely to occur imminently. Several commercial fishing associations have asserted that their members used to fish commercially in the Monument area. Industry groups and companies have publicly applauded the rollback, with some stating an intent to fish within the Monument.

205. Now that Defendants have revoked the 2021 Restoration Proclamation and the regulations prohibiting commercial fishing, any commercial fishing boat with a valid license and fishery permit can fish inside the Monument; they need no additional agency approval or permits before doing so.

206. Plaintiffs' injuries would be redressed by the relief sought here.

207. Plaintiffs have no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**
*Ultra vires* **action in excess of the authority**
**under the Antiquities Act**
*(All Defendants)*

208. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

209. Judicial review is available to ensure that the President's actions are consistent with constitutional principles; that the President's actions are within the scope of his statutory and constitutional authority; and that the President's actions do not violate laws enacted by Congress.

210. The President has the authority to regulate federal lands only to the extent that Congress has delegated that authority to the President.

61

211. In issuing his proclamation of February 6, 2026, President Trump acted without authority under, and thus violated, the Antiquities Act, 54 U.S.C. § 320301. Under the Act, Congress authorized the President to "declare" national monuments and to "reserve" lands and waters for the protection of objects of historic or scientific interest, but not to undo such designations or to abolish such reservations, in whole or in part. *Id.* § 320301(a), (b).

212. As a result, the 2026 Dismantling Proclamation was in excess of President Trump's delegated authority and contrary to the Antiquities Act. By purporting to rely on the Antiquities Act to do the opposite of what Congress empowered presidents to do, President Trump made an extreme error and acted entirely outside of the President's authority. The Proclamation is therefore *ultra vires* and unlawful.

213. The Antiquities Act does not preclude review of a President's compliance with the statute. There is no alternative procedure for review of whether a President has exceeded his delegated authority under this statute.

214. Even if the President had the authority to remove monument protections—which he does not—the President's authority may be exercised only in a manner consistent with the terms of the Antiquities Act, including the requirement for proper care and management of the objects of historic or scientific interest identified in the 2016 Designating Proclamation and 2021 Restoration Proclamation.

215.    When President Obama issued the 2016 Proclamation designating the Monument, he described the objects of scientific or historic interest that warranted protection under the Antiquities Act. He also determined that the prohibition on commercial fishing was an essential component of such protection. President Biden's 2021 Restoration Proclamation agreed with these determinations.

216.    The 2026 Dismantling Proclamation revoking the prohibition on commercial fishing deprives the Monument's objects of scientific or historic interest of the protections they had under the 2016 and 2021 Proclamations, leaving them vulnerable to the very damage that the Monument reservation was designed to avoid.

217.    The 2026 Dismantling Proclamation is based on considerations outside the Antiquities Act, lacks any adequate legal or factual justification, and is inconsistent with the proper care and management of the objects to be protected in the Monument.

218.    As a result, the 2026 Dismantling Proclamation violates the Antiquities Act and is unlawful.

**SECOND CLAIM FOR RELIEF**
**Violation of the U.S. Constitution and**
**the separation-of-powers doctrine**
***(All Defendants)***

219.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

220.    The Constitution vests Congress with exclusive power over federal territory and property, and foreign and interstate commerce. U.S. Const. art. IV, § 3, cl. 2; *id.* art. I, § 8, cl. 3.

221.    The President has the authority to regulate federal territory or the conduct of foreign and interstate commerce only to the extent that Congress has delegated that authority to the President.

222.    Congress has not delegated authority to the President to revoke protections for the proper care and management of monument objects or to abolish a national monument reservation, in whole or in part.

223.    The President has no independent authority to reduce or remove protections for a national monument.

224.    The 2026 Dismantling Proclamation is in excess of the President's authority under Article II of the U.S. Constitution and intrudes on Congress's exclusive power under the Property and Commerce Clauses, in violation of the doctrine of separation of powers.

**THIRD CLAIM FOR RELIEF**
**Violation of the APA:**
**Final agency action not in accordance with the law**
***(Defendants Lutnick and Jacobs)***

225.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

226.    The APA confers a right of action on any person adversely affected by a final agency action or a failure to act and waives the federal government's sovereign immunity. 5 U.S.C. §§ 702, 704.

227.    Because President Trump had no lawful authority to revoke protections from the Monument, the Secretaries of Commerce and the Interior and their subordinate officers remain subject to the 2016 and 2021 Proclamations' direction that they "shall prohibit" commercial fishing in the Monument.

228.    Defendants Lutnick and Jacobs have violated their duty to ensure NMFS's compliance with the 2016 Designating Proclamation by issuing the Rescission Rule. The Rescission Rule purports to implement the unlawful 2026 Dismantling Proclamation, in violation of the Monument's designation.

229.    The Rescission Rule is a final agency action subject to APA review. 5 U.S.C. § 704.

230.    Defendants Lutnick's and Jacobs's implementation of the unlawful 2026 Dismantling Proclamation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A).

**FOURTH CLAIM FOR RELIEF**
**Violation of the APA and the Magnuson-Stevens Act:**
**Failure to conduct notice-and-comment rulemaking**
***(Defendants Lutnick and Jacobs)***

231.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

232.    Defendants Lutnick and Jacobs are responsible for ensuring that NMFS complies with the Magnuson-Stevens Act and the APA. The Magnuson-Stevens Act requires all regulations under that Act promulgated by NMFS to follow

65

the APA's notice-and-comment procedures. 16 U.S.C. § 1855(d) (citing 5 U.S.C. § 533).

233.  Judicial review of the agency's compliance with the Magnuson-Stevens Act and the APA is appropriate pursuant to 5 U.S.C. §§ 702, 704 and 16 U.S.C. § 1855(f)(1).

234.  In 2024, NMFS codified a final rule, following notice and comment, prohibiting all commercial fishing within the Monument. *See* 89 Fed. Reg. at 12282.

235.  Following the issuance of the 2024 Prohibition Rule, any commercial fishing in the Monument violated the Magnuson-Stevens Act, which makes it unlawful for any person "to violate . . . any regulation" issued pursuant to the Act. 16 U.S.C. § 1857(1)(A).

236.  The Rescission Rule rescinded the regulation prohibiting commercial fishing in the Monument, formerly codified at 50 C.F.R. § 600.725(x).

237.  The Rescission Rule is a final agency action and a rulemaking with the force and effect of law. It was required to comply with the APA's notice-and-comment procedures, 5 U.S.C. § 553.

238.  In the Rescission Rule preamble, NMFS stated that public comment on this rule would be "impracticable, unnecessary, and contrary to the public interest," because "the removal of the prohibition on commercial fishing went into effect immediately upon issuance of the Proclamation," and it issued the rule to "conform to the [Rollback] Proclamation." 91 Fed. Reg. at 17159.

66

239. NMFS also stated that the Rescission Rule was "not discretionary, making the opportunity for prior public comment unnecessary," as the rule purported to simply "remove[] regulations that do not reflect current law." *Id.*

240. NMFS's only articulation of the public interest basis for skipping notice-and-comment was to "provide[] clarity and certainty to the fishing industry." *Id.*

241. NMFS's assessment that the agency's Rescission Rule was nondiscretionary, and therefore public comment is unnecessary, is incorrect. The 2026 Dismantling Proclamation found that "a prohibition on commercial fishing is not, at this time, necessary for the proper care and management of the [Monument] or the objects of historic or scientific interest therein," and that commercial fishing would not put the objects of historic and scientific interest at risk if it was "appropriately managed." 91 Fed. Reg. at 6489-90.

242. Even if the 2026 Dismantling Proclamation was lawful (it is not), NMFS violated its duty under the APA and the Magnuson-Stevens Act to solicit public comment to help determine what kind of "*appropriately managed commercial fishing*" is required to prevent putting "the objects of historic and scientific interest that the monument protects at risk" and to comply with the other applicable law, including the ten statutes cited in the Proclamation as guiding the agencies' management of fishing in the Monument. *See id.* (emphasis added).

243. NMFS retains significant discretion to regulate commercial fishing within the Monument. For example, NMFS could prohibit commercial fishing in

parts of the Monument, or consider other types of restrictions, such as catch limits, seasonal restrictions, or prohibitions on certain types of fishing gear.

244.    NMFS's failure to engage in notice-and-comment rulemaking violated 5 U.S.C.§ 553 and 16 U.S.C. § 1855(d).

245.    Because NMFS did not have good cause to forego notice and comment, the Rescission Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and done "without observance of procedure required by law," *id.* § 706(2)(D).

**FIFTH CLAIM FOR RELIEF**
**Violation of the APA and the Magnuson-Stevens Act:**
**Failure to engage in reasoned decision-making**
***(Defendants Lutnick and Jacobs)***

246.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

247.    The Magnuson-Stevens Act allows judicial review of any regulation promulgated by NMFS under the standards of the APA if a petition is filed within 30 days of the regulation's promulgation or publication in the Federal Register. 16 U.S.C. § 1855(f). The APA confers a right of action on any person adversely affected by a final agency action or a failure to act and waives the federal government's sovereign immunity. 5 U.S.C. §§ 702, 704.

248.    The 2026 Dismantling Proclamation declared that "*appropriately managed* commercial fishing would not put the objects of historic and scientific interest that the monument protects at risk." 91 Fed. Reg. at 6489 (emphasis added). NMFS "failed to consider an important aspect of the problem" when it (1)

68

did not acknowledge that the Antiquities Act required its management decisions to be compatible with the "proper care and management of the objects" of historic or scientific interest, 54 U.S.C. § 320301(b), and (2) did not seek to identify what "appropriately managed" fishing that could protect the Monument objects might be, 91 Fed. Reg. at 6489. Nowhere in the Rescission Rule did NMFS explain how reverting to the default regulatory regime would be adequate to protect the objects of historic or scientific interest or would be the best choice to satisfy the agency's obligations under other relevant statutes.

249.    Defendants' unreasoned decision-making was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. 5 U.S.C. § 706(2)(A).

**SIXTH CLAIM FOR RELIEF**
**Violation of NEPA and the APA:**
**Failure to conduct NEPA analysis**
*(Defendants Lutnick and Jacobs)*

250.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

251.    The Rescission Rule rescinds a previous regulation banning commercial fishing in the Monument, thereby allowing commercial fishing to occur within the Monument boundaries.

252.    The effect of the Rescission Rule was to adopt the regulations and management measures effective for the geographic area of the Monument absent the protections put in place by the Monument designation and the prior commercial fishing prohibition regulation.

69

253.    NMFS issued the Rescission Rule without conducting any NEPA analysis. NMFS did not rely upon a categorical exclusion or produce an EA or EIS.

254.    NMFS did not address whether the Rescission Rule was a major Federal action significantly affecting the quality of the human environment.

255.    NMFS gave one reason for not complying with the requirements of NEPA in the Rescission Rule. It asserted that NEPA did not apply to the rule because it "merely conforms the Magnuson-Stevens Act regulations to applicable law under the [2026 Dismantling Proclamation]" and NMFS therefore had "no discretion." 91 Fed. Reg. at 17159-60.

256.    The Rescission Rule is a major Federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(C).

257.    NMFS has discretion to regulate commercial fishing in the Monument, pursuant to the Magnuson-Stevens Act and other statutory authorities.

258.    The 2026 Dismantling Proclamation leaves NMFS with discretion in deciding how to regulate commercial fishing in the Monument, and NEPA requires NMFS to consider the reasonably foreseeable environmental impacts of exercising that discretion.

259.    NMFS's failure to produce an EIS, an EA, a FONSI, or any other NEPA analysis in connection with the Rescission Rule violates NEPA and renders the Rescission Rule "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," under the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court:

70

1.      Declare that President Trump's proclamation of February 6, 2026, is *ultra vires*, invalid, and void ab initio;

2.      Declare that President Trump's proclamation of February 6, 2026, exceeds the President's authority under Article II of the U.S. Constitution, violates the separation-of-powers doctrine, and is invalid and void ab initio;

3.      Declare that the Rescission Rule is arbitrary and capricious and contrary to law;

4.      Declare that NMFS violated the APA and the Magnuson-Stevens Act by issuing the Rescission Rule without notice-and-comment rulemaking, without good cause;

5.      Declare that NMFS violated the APA by failing to engage in the required NEPA analysis prior to issuing the Rescission Rule;

6.      Vacate the Rescission Rule;

7.      Issue injunctive relief against the Agency Defendants directing them to carry out their mandatory duties imposed in the 2016 Proclamation and enjoining them from carrying out President Trump's proclamation of February 6, 2026;

8.      Award Plaintiffs fees and costs pursuant to 28 U.S.C. § 2412; and

9.      Grant such other relief as the Court deems just and proper.

Dated: May 4, 2026

Respectfully submitted,

/s/ Jacqueline M. Iwata
Jacqueline M. Iwata (D.C. Bar No. 1047984)
Devon Flanagan (D.C. Bar No. 1022195) (*pro hac vice* forthcoming)
Natural Resources Defense Council
1152 15th Street, NW Suite 300
Washington, DC 20005
(202) 289-6868
jiwata@nrdc.org
dflanagan@nrdc.org

Katherine Desormeau (D.D.C. Bar ID CA00024)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
kdesormeau@nrdc.org

Lauren P. Phillips (*pro hac vice* forthcoming)
Natural Resources Defense Council
40 W. 20th Street, 11th Floor
New York, NY 10011
(212) 727-4415
lphillips@nrdc.org

Jennifer A. Friedmann* (*pro hac vice* forthcoming)
Natural Resources Defense Council
20 N. Wacker Dr., Suite 1600
Chicago, IL 60606
(312) 847-6827
jfriedmann@nrdc.org
*Admitted to practice law in California*

*Counsel for Plaintiff Natural Resources Defense Council*

/s/ Erica A. Fuller
Erica A. Fuller (D.D.C. Bar. ID MA001)
Chloe C. Fross (D.D.C. Bar ID MA0048)
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
(617) 850-1727
efuller@clf.org
cfross@clf.org

*Counsel for Plaintiff Conservation Law Foundation*

/s/ Kristen Monsell
Kristen Monsell (*pro hac vice* forthcoming)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7137
kmonsell@biologicaldiversity.org

*Counsel for Plaintiffs Klyver & Center for Biological
Diversity*