**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION<br>62 Summer Street<br>Boston, Massachusetts 02110<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC.<br>40 West 20th Street, 11th Floor<br>New York, New York 10011<br><br>R. ZACK KLYVER<br>1 West Street<br>Bar Harbor, Maine 04609<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 N. Main Avenue<br>Tucson, Arizona 85701<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States<br>1600 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>DOUG BURGUM, in his official capacity as Secretary of the Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240<br><br>HOWARD LUTNICK, in his official capacity as Secretary of the Department of Commerce<br>1401 Constitution Avenue, NW<br>Washington, DC 20230 | Case No. 1:26-cv-01528-JEB |

| | |
|---|---|
| NEIL JACOBS, in his official capacity as Administrator of the National Oceanic and Atmospheric Administration<br>1401 Constitution Avenue NW, Room 5128<br>Washington, DC 20230<br><br>*Defendants*. | |

**FIRST AMENDED & SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1. Off the coast of southern New England, three underwater canyons cut into the continental shelf break, rivaling the Grand Canyon in depth. Beyond the canyons lie the only four seamounts—extinct undersea volcanoes—in the U.S. Atlantic waters. These dramatic landforms shape ocean-current patterns that create a three-dimensional biologic hotspot, providing food, shelter, and nursery habitat to an exceptional range of sea life. The area is an important feeding ground for seabirds; endangered sperm, sei, and fin whales; and endangered sea turtles. It is also home to deep-sea corals, which developed over hundreds or thousands of years and form the foundation for complex deep-sea ecosystems, providing habitat and shelter for communities of creatures that live on and around them.

2. In 2016, recognizing both the scientific importance and fragility of this area, President Barack Obama designated the area the Northeast Canyons and Seamounts Marine National Monument (the "Monument" or "Northeast Canyons and Seamounts"), pursuant to the Antiquities Act of 1906, 54 U.S.C. § 320301 ("the Act"). *See* 81 Fed. Reg. 65161, 65163 (Sep. 15, 2016) ("2016 Designating Proclamation"). To protect the extraordinary resources within the Monument, the

2016 Designating Proclamation prohibited commercial extractive activities—including commercial fishing—within its boundaries. *Id.* at 65164-65.

3. But recent executive action has attempted to strip the Monument of a core protection. This case challenges: (1) President Donald J. Trump's unlawful proclamation of February 6, 2026, which purports to revoke the Monument designation's ban on commercial fishing; and (2) the final rule rescinding the regulation, issued under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), that had prohibited commercial fishing within the Monument. Proclamation No. 11009, 91 Fed. Reg. 6489 (Feb. 6, 2026) ("2026 Dismantling Proclamation"); 91 Fed. Reg. 17159 (Apr. 6, 2026) ("Rescission Rule"). The 2026 Dismantling Proclamation is this President's second attempt to open the Monument to commercial fishing after he attempted to do so during his first term, *see* Proclamation No. 10049, 85 Fed. Reg. 35793 (June 5, 2020) ("2020 Dismantling Proclamation"), and President Joseph Biden restored protections, *see* Proclamation No. 10287, 86 Fed. Reg. 57349 (Oct. 8, 2021) ("2021 Restoration Proclamation").

4. The prohibition on commercial fishing protected the objects of historic and scientific interest within the Monument that the 2016 Designating Proclamation recognized as extremely sensitive to disturbance from extractive activities. Even when otherwise lawful, commercial fishing can harm ocean ecosystems, particularly highly vulnerable ones like those within the Monument. Commercial fishing intentionally removes large amounts of marine life, altering the

food web. Commercial fishing gear, including heavy crab traps and lobster pots with fixed vertical lines, can capture and entangle marine wildlife—including dolphins, sharks, seabirds, endangered whales, and sea turtles—and harm fragile and slow-growing deep-sea corals. Prohibiting commercial fishing also made the Monument a crucial reference site in the deep sea—unique in the U.S. Atlantic Ocean—where scientists could study marine species and ecosystems undisturbed by destructive commercial extractive activities.

5. Although the 2026 Dismantling Proclamation cited the Act and the U.S. Constitution as the source of President Trump's authority, neither authorizes his proclamation. The Constitution gives Congress, not the President, the exclusive power to regulate U.S. territory and property. In the Act, Congress delegates authority to the President to *create* national monuments and *reserve* federally owned or controlled lands and waters to protect objects of scientific or historic interest. It does not give the President the opposite power to *revoke* those protections; Congress retained that latter power for itself. The 2026 Dismantling Proclamation was wholly without statutory or constitutional authority and is therefore unlawful.

6. On April 6, 2026, the National Marine Fisheries Service (NMFS) published the Rescission Rule. 91 Fed. Reg. at 17159. This final rule rescinded the regulation banning commercial fishing within the Monument boundaries, effective immediately, subjecting the Monument to commercial fishing limited only by existing regulations and fishery management actions in the region. *Id.* Claiming

that it lacked discretion to consider any other alternatives, NMFS promulgated this final rule without advance notice to the public, an opportunity for public comment, or any analysis of environmental impacts under the National Environmental Policy Act (NEPA). *Id.* at 17159. NMFS also provided no rationale for its rule other than asserting the 2026 Dismantling Proclamation required it.

7. But NMFS did have discretion, under the 2026 Dismantling Proclamation and other applicable laws, to consider whether existing regulations protected the Monument's objects of historic or scientific interest and adopt alternatives. The Rescission Rule improperly relied upon an unlawful Proclamation, failed to provide any factual support or sound reasoning for its selected action, violated the procedural requirements of the Administrative Procedure Act (APA) and Magnuson-Stevens Act, and failed to comply with the agency's obligations to consider environmental impacts under NEPA.

8. The commercial fishing activities permitted by the 2026 Dismantling Proclamation and the Rescission Rule are incompatible with the proper care and management of the objects of historic or scientific interest identified in the 2016 Designation and 2021 Restoration Proclamations and protected by the Monument's reservation. The 2026 Dismantling Proclamation and Rescission Rule deprive the Monument's historic and scientific objects of core protections, leaving them vulnerable to the very damage the Monument reservation was designed to avoid.

9. This Court should declare the 2026 Dismantling Proclamation and Rescission Rule unlawful, set aside the Rescission Rule, and enjoin Secretary

Burgum, Secretary Lutnick, and Administrator Jacobs (collectively "Agency Defendants") from implementing the 2026 Dismantling Proclamation.

## JURISDICTION AND VENUE

10. This case arises under the laws of the United States and its Constitution. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331. Additionally, this court has jurisdiction over challenges to the Rescission Rule pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1861(d).

11. Plaintiffs' claims challenging the Rescission Rule are subject to judicial review pursuant to the APA, 5 U.S.C. §§ 702, 704, 706, and the Magnuson-Stevens Act, 16 U.S.C. § 1855(f).

12. The Magnuson-Stevens Act provides that regulations issued by the Secretary of Commerce pursuant to that law are subject to review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f)(1). Defendants published the 2026 Dismantling Regulation on April 6, 2026, in the Federal Register. Plaintiffs filed the initial Complaint on May 4, 2026, within thirty days of publication of the Final Rule.

13. The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and inherent authority to issue equitable relief. Injunctive relief is also authorized by 5 U.S.C. § 706.

14. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

15. Venue is proper in this court pursuant to 28 U.S.C. § 1391(e)(1)(A)-(B) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims took place in this district.

**PLAINTIFFS**

16. Plaintiff CONSERVATION LAW FOUNDATION (CLF) is a non-profit membership organization dedicated, *inter alia*, to protecting marine wildlife and their habitats as well as other coastal and ocean resources in New England.

17. To further these goals, CLF undertakes litigation and other legal advocacy on behalf of its members' interests; educates its members on conservation issues and on threats, challenges, and solutions for New England's oceans so they can exercise their rights and protect their interests in those resources; promotes public awareness, education, and citizen involvement in the conservation of marine wildlife and resources; and supports and advances science and programs for the conservation of marine wildlife and their habitats. CLF members, staff, and partners include scientists, researchers, and analysts who regularly conduct science, gather data, and rely on scientific research to ensure evidenced-based decision-making that leads to lasting solutions to New England's most complex environmental challenges.

18. On behalf of its 8,000 members, CLF has engaged for nearly 40 years in advocacy to protect vulnerable species and ecologically important marine habitat, including the submerged lands and waters east of Georges Bank where the

Monument is designated, from all extractive activities. As part of this work, CLF advocated extensively on behalf of its members for the creation of the Monument.

19. Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC. (NRDC) is a non-profit environmental membership organization with hundreds of thousands of members nationwide, including tens of thousands of members in states along the northeastern Atlantic seaboard. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. Science is the foundation of NRDC's work to protect people and the environment. NRDC's members include scientists, and NRDC partners with scientists and regularly conducts, facilitates, and uses scientific research to understand and solve complicated environmental problems and to develop and advocate for evidence-based policies that protect the natural systems on which people depend. Advancing rigorous scientific study is central to NRDC's mission.

20. For more than three decades, NRDC has advocated for the protection and long-term sustainability of ocean resources on behalf of its members. A central part of NRDC's mission is to protect the nation's seas from harmful exploitation and to conserve the oceans' living resources.

21. NRDC has long worked to prevent and combat damage from extractive activities, including harmful commercial fishing practices, in and around the Monument and elsewhere in the Atlantic Ocean. NRDC advocated for the creation and ongoing protection of the Monument on behalf of its members.

22. For 30 years, Plaintiff R. ZACK KLYVER was the Lead Naturalist for Bar Harbor Whale Watch Company, located in Bar Harbor, Maine. Since April 2019, he has continued to work on a part-time basis as a naturalist for Bar Harbor Whale Watch Company, leading trips to observe whales and other marine life several times per week throughout the summer and fall tourist seasons.

23. In 2019, he co-founded Blue Planet Strategies, LLC, a consulting firm that uses science and law to help its clients solve ocean conservation problems around the world. He directed science for the firm until 2023.

24. Presently, Mr. Klyver works as a marine mammal consultant with a number of organizations, including as the marine mammal advisor to Blue Green Future. Mr. Klyver also owns his own international ecotourism company called Flukes, Inc., that specializes in taking clients to see whales around the world. He is also the vice-chair of the Atlantic Herring Advisory Panel for the New England Fishery Management Council.

25. Mr. Klyver has guided over 3,000 trips and taken over 600,000 passengers to see and learn about the whales, seabirds, and other marine wildlife of the northwest Atlantic Ocean. The Monument's protections benefitted Mr. Klyver by facilitating scientific research on species and ecosystems in these areas and providing the seabirds and marine species with an important refuge for feeding, breeding, and migration, making it more likely that Mr. Klyver can view such species in and near the Monument. His ecotourism company Flukes, Inc. is

planning a June 2027 tour to the Monument. While this trip was originally planned for August 2026, it was moved to June 2027 for logistical reasons.

26. Mr. Klyver actively supported the creation of the Monument, including by speaking at a public hearing in Providence, Rhode Island, in September 2015, as well as at other public educational events.

27. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit environmental organization whose primary mission is to ensure the long-term health and viability of animal and plant communities around the world and to protect both the natural world and humans from environmental harms.

28. The Center has devoted considerable resources to ensuring the conservation and sound management of numerous marine species threatened by destructive activities in our oceans, including unsustainable fishing practices.

29. Plaintiffs and their members benefited from the Monument's closure to commercial fishing. Thus, as described in greater detail below, they would benefit from an order declaring the 2026 Dismantling Proclamation and Rescission Rule unlawful, vacating the Rescission Rule, and enjoining the Agency Defendants from implementing the Proclamation.

**DEFENDANTS**

30. Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States.

31. President Trump resides and conducts his duties in Washington, D.C.

32. Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior of the United States.

33. Secretary Burgum is responsible for ensuring that the Department of the Interior and its constituent agencies, including the U.S. Fish and Wildlife Service, comply with the applicable law, including the 2016 and 2021 Proclamations' directives and requirements for managing the Monument.

34. The Secretary of the Interior resides and conducts his duties in Washington, D.C.

35. Defendant HOWARD LUTNICK is sued in his official capacity as the Secretary of Commerce of the United States.

36. Secretary Lutnick is responsible for ensuring that the Department of Commerce and its constituent agencies, including the National Oceanic and Atmospheric Administration (NOAA) and NMFS, an office within NOAA, comply with the applicable law, including the 2016 and 2021 Proclamations' directives and requirements under the APA, NEPA, and the Magnuson-Stevens Act.

37. The Secretary of Commerce resides and conducts his duties in Washington, D.C.

38. Defendant DR. NEIL JACOBS is sued in his official capacity as the Administrator of NOAA within the U.S. Department of Commerce.

39. The Administrator of NOAA is responsible for ensuring that NOAA and its subcomponents, including NMFS, comply with the applicable law, including

the 2016 and 2021 Designating Proclamations' directives and requirements under the APA, NEPA, and the Magnuson-Stevens Act.

40. The Administrator of NOAA resides and conducts his duties in Washington, D.C.

41. The above-named Defendants have the authority, ability, and obligation to remedy the harms to Plaintiffs' and their members' interests.

## LEGAL BACKGROUND

### I. The Antiquities Act

42. The Constitution vests Congress with exclusive power over federal territory and property and foreign and interstate commerce. U.S. Const. art. IV, § 3, cl. 2; *id.* art. I, § 8, cl. 3.

43. In 1906, Congress enacted the Antiquities Act, delegating some of its authority over federal territory by authorizing the President to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and to "reserve parcels of land as a part of the national monuments" that constitute the smallest area "compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(a), (b). The Act gave the President authority to protect objects of historic or scientific value *in situ* in recognition that individual resources may be "of comparatively little value when scattered about either in museums or private collections." H.R. Rep. No. 59-2224, at 3 (1906).

44. Exercising Congress's delegation of authority in the Act, presidents have declared and reserved national monuments as varied as the Statue of Liberty in New York, Buck Island Reef National Monument in the U.S. Virgin Islands, and the Grand Canyon in Arizona. Depending on the nature and location of the objects to be protected, national monument designations have ranged from just a few acres to millions of acres.

45. A President's national monument designation confers protection on the identified "objects of historic or scientific interest" and on the area reserved as part of the monument. 54 U.S.C. § 320301(a), (b). In a national monument, protection of the objects of historic or scientific interest is the paramount purpose for which the area is to be managed.

46. When designating a national monument, the President may "reserve" federally owned or controlled lands and waters as part of the monument, 54 U.S.C. § 320301(b), and as part of that reservation may impose specific use restrictions necessary for the "proper care and management of the objects to be protected," *id.*

47. National monuments have a long history of contributing to our understanding of natural history and science. Soon after enactment, presidents used their powers under the Act to declare land formations and habitats as national monuments so that they could be studied. *See, e.g.*, Proclamation No. 1733, 43 Stat. 1988 (1925) (Glacier Bay National Monument "presents a unique opportunity for the scientific study of glacial behavior and of resulting movements and development of flora and fauna" as well as "relics of ancient interglacial forests"); Proclamation

No. 753, 35 Stat. 2131 (1907) (Cinder Cone National Monument "illustrat[es] . . . volcanic activity which [is] of special importance in tracing the history of the volcanic phenomena of that vicinity").

48. To protect objects of historic or scientific interest, presidents' monument proclamations have frequently withdrawn monuments from the operation of mineral disposition and leasing laws. Presidents have also prohibited other extractive activities in monuments that would threaten the objects of interest, such as prohibiting commercial fishing in the Papahānaumokuākea Marine National Monument in the Pacific Ocean, Proclamation No. 8031, 71 Fed. Reg. 36443, 36446-47 (June 15, 2006), and banning timber harvesting to protect the "primeval" forests in Muir Woods National Monument in California, Proclamation No. 793, 35 Stat. 2174 (1908).

49. When such use restrictions are imposed in a President's designating proclamation, they are part of the monument reservation and have the force of law.

50. The Act does not authorize presidents to dismantle previously designated national monuments, either completely or by removing protections that were part of the original reservation. Congress retains that power.

## II. The Administrative Procedure Act (APA)

51. The APA, 5 U.S.C. §§ 551-59, 701-06, sets forth the procedures by which federal agencies are accountable to the public and their actions are subject to judicial review.

52. Among other things, the APA defines the procedures that agencies must follow for "rule making," defined as the process of "formulating, amending, or

repealing a rule." *Id.* § 551(5). "Rule," in turn, is defined broadly to include "an agency statement of general or particular applicability and future effect [that is] designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

53. Section 4 of the APA, *id.* § 553, prescribes a three-step procedure for what is known as "notice-and-comment rulemaking." First, the agency must issue a "notice of proposed rule making," ordinarily by publication in the Federal Register. *Id.* § 553(b). Second, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." *Id.*

54. An agency action that meets the definition of a rule must go through notice-and-comment rulemaking subject to two exceptions. Unless another statute states otherwise, the notice-and-comment requirement "does not apply" (1) to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice"; or (2) "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(A)-(B).

55. The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

56. The APA confers a right of action on any person adversely affected or aggrieved by a final agency action or failure to act. *Id.* § 702. The APA waives the federal government's sovereign immunity for such claims. *Id.*

57. Under the APA, a reviewing court has the authority to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law." *Id.* § 706(2)(A)-(D).

**III. The Magnuson-Stevens Act**

58. The Magnuson-Stevens Act, 16 U.S.C. §§ 1801 *et seq.*, sets the default regime for commercial fishing in U.S. waters, including the Exclusive Economic Zone, from 3 to 200 nautical miles from the coast.

59. The Magnuson-Stevens Act directs regional fishery management councils to prepare fishery management plans. *Id.* § 1852(h)(1). All fishery management plans or plan amendments must be approved, disapproved, or partially approved by the Secretary of Commerce. *Id.* § 1854(a)(3). The Secretary of Commerce has authority to issue regulations implementing fishery management plans or plan amendments or which may be necessary to carry out any other provision of the Magnuson-Stevens Act, subject to the APA's procedural requirements. *Id.* §§ 1854(b), 1855(d).

60. The Magnuson-Stevens Act requires NMFS to balance different interests in its management decisions. *See id.* § 1851(a).

61. The Magnuson-Stevens Act and APA mandate notice-and-comment rulemaking before NMFS may adopt any fishery management plan, plan amendment, or regulation. *Id.* §§ 1854(a)-(c), 1855(d); 5 U.S.C. § 553.

**IV. The National Environmental Policy Act (NEPA)**

62. Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. Congress affirmed "the continuing responsibility of the Federal Government to use all practicable means" to, among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "preserve important historic, cultural, and natural aspects of our national heritage." *Id.* § 4331(b)(1), (4).

63. To accomplish Congress's goals, NEPA generally requires every federal agency, including NMFS, to consider fully and disclose in a "detailed statement," known as an environmental impact statement (EIS), the environmental consequences of and potential alternatives to any major federal action significantly affecting the quality of the human environment, prior to issuing a final decision. *Id.* § 4332(2)(C). An agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in [its] environmental document," *id.* § 4332(2)(D), and must "make use of reliable data and resources," *id.* § 4332(2)(E).

64. NEPA requires federal agencies, including NOAA and NMFS, to "identify the reasonable alternatives to the contemplated action and look hard at

the environmental effects of its decision" before taking action. *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014) (cleaned up).

65. The agency must make the EIS available to the public and provide an opportunity for public comment. 42 U.S.C. § 4332(2)(C); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

66. Agencies often use an environmental assessment (EA) to determine if an EIS is required or to analyze agency actions that do not significantly affect the quality of the human environment. If the EA concludes that no EIS is required, agencies issue a "Finding of No Significant Impact" (FONSI) to document their determination.

67. According to NOAA's Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities, Companion Manual for NOAA Administrative Order 216-6A, at 10 (June 30, 2025) ("NOAA Companion Manual"), "NOAA shall prepare an EA with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown, unless the agency finds that the proposed agency action is excluded pursuant to [a categorical exclusion]."

68. The NOAA Companion Manual states that "[a] decision maker must prepare a FONSI if they determine, based on the EA, not to prepare an EIS because the proposed activity or decision will not have significant effects." *Id*. at 12.

69. The NOAA Companion Manual requires the agency to "publish the EA and FONSI on a public website, such as on the NOAA NEPA website." *Id.*

70. Courts reviewing an agency's determination not to complete an EIS consider whether the agency has (1) "accurately identified the relevant environmental concern," (2) taken the required "hard look at the problem," and (3) made "a convincing case for its finding" that the action does not significantly affect the quality of the human environment. *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340-41 (D.C. Cir. 2002) (quoting *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985)). NEPA compliance is reviewed in accordance with the APA's judicial review provisions.

## FACTUAL BACKGROUND

### I. The undisputed value of the Northeast Canyons and Seamounts Marine National Monument's objects of historic or scientific interest

71. The Northeast Canyons and Seamounts Marine National Monument encompasses a cluster of four extinct undersea volcanoes (named Bear, Physalia, Retriever, and Mytilus) and three large undersea canyons (Oceanographer, Lydonia, and Gilbert) that cut into the continental shelf about 130 miles off the coast of Cape Cod, Massachusetts. "Together, the monument's submarine canyons and seamounts create the unique ecological conditions necessary to support one of the Atlantic Ocean's most biologically productive and important marine environments and one of science's greatest oceanic laboratories." 86 Fed. Reg. at 57349.

72. The dramatic and varied terrain of these canyons and seamounts, upwellings and other complex current patterns, and the wide range of marine

habitats at different depths combine to create three-dimensional biological hotspots that offer food, shelter, and nursery habitats to exceptionally diverse and abundant sea life.

73. The canyons and seamounts area has attracted intense scientific interest, particularly over the last decade and a half as deep-sea exploration technologies have advanced. With every exploration of the Monument area, scientists make new discoveries.

74. To date, for example, scientists have found at least 58 different species of deep-sea corals living within the Monument, including several newly discovered species. Corals found at these depths (starting at 50 meters and reaching 4,000 meters below sea level) grow exceptionally slowly and host complex communities of creatures living on and around them, including many fish and invertebrate species.



*Fig. 1: Paramuriceid seafan (octocoral) in Oceanographer Canyon*
*Credit: NOAA, Northeast U.S. Canyons Expedition 2013*



*Fig. 2:* Colony of bamboo coral with crinoids on Mytilus Seamount
*Credit: NOAA, Northeast U.S. Canyons Expedition 2013*

75. From the ocean floor to the ocean surface, along the flanks and crowns of the seamounts, and from the continental rise to the shelf around the canyon heads, the Monument's varied terrain supports rare and unusual lifeforms and important ecological relationships. Complex interactions occur between and across the different benthic (seafloor) and pelagic (water column) environments. For example, powerful currents created by the steep walls and slopes of the canyons and seamounts lift nutrients upward towards the surface. Such nutrient upwellings fuel the growth of plankton, the base of the food chain, which attract schools of small fish and the larger animals that, in turn, prey on them. In this way, the Monument's specific features support deeply interconnected species and habitats.

76. These biological and oceanographic dynamics make the canyons and seamounts area an important feeding ground for numerous species, including seabirds such as puffins, gulls, shearwaters, storm petrels, gannets, skuas, and terns; large predatory fish such as tunas and sharks; and multiple species of

whales, dolphins, and sea turtles, some of which are endangered (such as sperm, sei, fin, and blue whales; and leatherback sea turtles).

77. For example, the canyons and seamounts area is the critical winter feeding ground for Maine's breeding population of Atlantic puffins, a population that nearly went extinct in the United States in the 1970s. No one knew where these birds spent their winter months until 2015 when, using geolocation devices, scientists discovered that the birds spend several months each winter at sea, in and around the Monument, because of food abundance. Another recent tracking study shows that endangered black-capped petrels use the Monument, traveling from their nesting grounds in the Caribbean.



*Fig. 3: Atlantic puffin*
*Credit: Project Puffin / Stephen W. Kress*

78. A peer-reviewed published study found that the canyons area of the Monument contains higher marine mammal species diversity than virtually any

(>98% of other areas) other comparably sized area on the Atlantic seaboard and generally protects a diverse and unique marine mammal community.

79. The Monument also tells the history of the planet. Parts of the Monument were above sea level during the last ice age due to much of the current ocean being frozen in glaciers, as evidenced by woolly mammoth bones found on its seamounts.

## II. Legal efforts to protect the objects of historic and scientific interest within the Monument

### A. 2015-2016: National Monument designation

80. In 2015, several Plaintiffs and other stakeholders began calling for full and permanent protection of the canyons and seamounts area.

81. The Monument had broad support in the region, including from scientists, members of the public, coastal businesses, recreational fishermen, state and local political officials, religious leaders, the region's two leading aquaria, local and regional conservation organizations, and others. The Connecticut congressional delegation submitted to the Obama Administration a formal proposal to designate the Monument that encompassed five major canyons and the four seamounts.

82. Following a public meeting, several rounds of regional stakeholder meetings, and a public comment period that was open for more than a year, President Obama issued the 2016 Proclamation establishing the Monument. 81 Fed. Reg. at 65161.




*Fig. 4:* Map of Northeast Canyons and Seamounts Marine National Monument
*Credit: NOAA*

83. The Monument is composed of two units covering roughly 4,900 square miles total, and it is located entirely within the U.S. Exclusive Economic Zone of the Atlantic Ocean. It is the only marine national monument in the U.S. Atlantic Ocean.

84. The Canyons Unit covers approximately 940 square miles and includes three major underwater canyons, which are outstanding examples of these ecologically rich ocean features. The Seamounts Unit encompasses roughly 3,900 square miles and includes the only four seamounts found in the U.S. Atlantic.

85. Between the Canyons Unit and the Seamounts Unit is a transit corridor for commercial fishing vessels along the continental shelf break.

86. The 2016 Designating Proclamation identified "the canyons and seamounts themselves, and the natural resources and ecosystems in and around them," as "objects of historic and scientific interest" to be protected under the Act, and it reserved the Monument's submerged lands and waters "for the care and management of the objects of historic and scientific interest therein." The 2016 Designating Proclamation provided that the Monument's boundaries were drawn to encompass the smallest area compatible with the proper care and management of the objects to be protected.

87. The 2016 Designating Proclamation directed the Secretary of Commerce (through NOAA) and the Secretary of the Interior (through the U.S. Fish and Wildlife Service) to share management responsibility for the Monument pursuant to their applicable legal authorities.

88. The 2016 Designating Proclamation directed that the Secretaries "shall prohibit" certain destructive activities and uses in the Monument—including oil and gas leasing and "[f]ishing commercially"—to ensure the proper care and management of the Monument's objects of interest.

89. The 2016 Designating Proclamation's commercial fishing prohibition for most fisheries took effect within 60 days of the 2016 Proclamation's issuance. The Proclamation provided for a seven-year phase-in of the prohibition for commercial fishing for American lobster and red crab under existing permits.

### B. 2017-2020: Threats to the Monument

90. In March 2017, five fishing industry groups filed a lawsuit in this Court challenging the 2016 Designating Proclamation. They claimed, *inter alia*, that the Act did not apply in the ocean and that the Monument was too large.

91. CLF, NRDC, Mr. Klyver, and the Center—all Plaintiffs here—intervened in that litigation to defend the Monument.

92. In April 2017, President Trump issued two executive orders directing the Secretaries of the Interior and Commerce to review certain national monuments, including Northeast Canyons and Seamounts. Exec. Order No. 13792, 82 Fed. Reg. 20429 (Apr. 26, 2017); Exec. Order No. 13795, 82 Fed. Reg. 20815 (Apr. 28, 2017).

93. Public comments submitted during the agencies' reviews were overwhelmingly supportive of national monuments in general, and of Northeast Canyons and Seamounts in particular.

94. According to press reports, in 2017, Interior official Randy Bowman emailed a memorandum to other Interior officials outlining a proposal to revoke protections from the Monument, with the following caveat: "In my initial draft of this memo, which was (by direction) for revoking the designation rather than just removing the fishing restrictions, I did not even mention [economic] impacts to fishermen, as I felt they were so minor in the context of the overall New England fishing industry as to undercut the case for making changes [to the Monument]."

95. Despite the agencies' review, the Northeast Canyons and Seamounts remained protected from 2017 through 2020, and the industry groups' legal

challenge progressed. On a motion to dismiss, this Court held that President Obama's designation of the Monument was a valid exercise of his Antiquities Act authority. *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48 (D.D.C. 2018). The D.C. Circuit affirmed. *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 979 (2021).

96. On June 5, 2020, President Trump issued a proclamation purporting to "amend[]" the 2016 Designating Proclamation by revoking its prohibition against commercial fishing in the Monument. 85 Fed. Reg. at 35793.

97. Plaintiffs filed a lawsuit challenging the 2020 Dismantling Proclamation on June 17, 2020. *See* Compl., *Conservation L. Found. v. Trump*, No. 1:20-cv-01589 (D.D.C. filed June 17, 2020), Dkt. No. 1.

**C. 2021-2025: Restoration and enhanced protections**

98. In 2021, President Biden took office and issued an executive order initiating a review of the prior administration's national monument rollbacks. Exec. Order No. 13990, 86 Fed. Reg. 7037, 7039 (Jan. 20, 2021). In October 2021, the President reinstated the ban on commercial fishing within the Monument. 86 Fed. Reg. at 57352. As a result, Plaintiffs voluntarily dismissed their lawsuit in this Court challenging the 2020 Dismantling Proclamation. Notice of Volunt. Dismissal, *Conservation L. Found.*, No. 20-cv-01589 (D.D.C. filed Nov. 10, 2021), Dkt. No. 36.

99. In November 2022, NMFS held a public hearing and published a notice seeking comments ahead of drafting an action to implement the 2016 Designating and 2021 Restoration Proclamations. 87 Fed. Reg. 67677 (Nov. 9, 2022).

100. In October 2023, NMFS published and requested public comment on its proposed rule incorporating the Monument and the commercial fishing prohibition into existing fishing regulations. 88 Fed. Reg. 72038 (Oct. 19, 2023).

101. On February 16, 2024, NMFS issued its final rule codifying the commercial fishing prohibition found in the 2016 and 2021 Proclamations. 89 Fed. Reg. 12282 (Feb. 16, 2024) ("Fishing Prohibition Rule"). During the public comment period, Plaintiffs, members of the public, and others expressed support for the Monument's protection. *See, e.g.*, *id.* at 12283.

102. On June 4, 2024, the U.S. Fish and Wildlife Service and NOAA issued the final monument management plan and environmental assessment. The 2022-2023 public meetings and comment periods on this plan similarly reflected extensive public support for comprehensive protections. *See, e.g.*, Summary of Public Comments Submitted to FWS & NOAA regarding the NECSM draft Monument Management Plan and Environmental Assessment, No. FWS-R5-NWRS-2023-0154, https://www.regulations.gov/document/FWS-R5-NWRS-2023-0154-0001/comment. The management plan includes provisions for species monitoring and additional scientific study.

103. In April 2024, two individuals filed a challenge to the 2021 Restoration Proclamation, as well as NMFS's new regulation. Compl., *Green v. Biden*, No. 2:24-cv-1975 (E.D.N.Y. filed Mar. 18, 2024), Dkt. No. 1. Plaintiffs intervened in the case, which is currently stayed. Order, *Green*, No. 2:24-cv-1975 (E.D.N.Y. Mar. 13, 2026).

### D. 2026-Present: Second dismantling

104. On April 17, 2025, President Trump issued Executive Order 14,276, which, among other actions, directed the Secretary of Commerce, in consultation with the Secretary of the Interior, to "review all existing marine national monuments and provide recommendations to the President of any that should be opened to commercial fishing" within 180 days. Exec. Order No. 14276, 90 Fed. Reg. 16993, 16995 (Apr. 17, 2025).

105. On August 27, 2025, NMFS invited public comments "on suggestions to improve fisheries management and science within the requirements of applicable laws" in accordance with Executive Order 14276. 90 Fed. Reg. 41818 (Aug. 27, 2025). Although the notice named several sections in Executive Order 14,276 on which it sought comment, the notice did not mention marine national monuments or reference the section of the Executive Order directing the Secretary of Commerce to "review all existing marine national monuments and provide recommendations to the President of any that should be opened to commercial fishing." *Compare id.* at 41818-19, *with* Exec. Order No. 14276, § 4(h), 90 Fed. Reg. at 16995.

106. Despite requests from Plaintiffs and others, the Department of Commerce did not solicit public comments on the possibility of lifting the commercial fishing ban in the Monument. Nonetheless, Plaintiffs and other groups submitted information in support of maintaining protections for the Monument as part of the public comment process for fisheries management and science improvements.

107. In their comments, Plaintiffs articulated that (1) the commercial fishing prohibition is necessary for the proper care and management of the Monument's objects; (2) protection of the Monument from commercial fishing impacts has not harmed the American seafood industry; (3) the President lacks the legal authority to revoke or modify the Monument's use restrictions or boundaries; and (4) notice-and-comment rulemaking would be required to revoke the regulation prohibiting commercial fishing in the Monument.

108. On February 6, 2026, President Trump issued the 2026 Dismantling Proclamation. 91 Fed. Reg. at 6489. The 2026 Dismantling Proclamation found that "removing the restrictions on commercial fishing . . . to allow for well-regulated commercial fishing use, in accordance with and pursuant to existing statutory authorities, is in the public interest" and "that appropriately managed commercial fishing would not put the objects of historic and scientific interest that the monument protects at risk." *Id.* The Proclamation listed ten statutes, aside from the Antiquities Act, that govern the agency's management actions and the protection of plant and animal resources in the Monument. *Id.* at 6489-90. Any reports or recommendations that the Secretaries of Commerce or the Interior made to the President have not been made public.

109. The 2026 Dismantling Proclamation purported to revoke the 2021 Restoration Proclamation and reinstate the 2020 Dismantling Proclamation from President Trump's first term. *Id.* at 6490.

110. No other President in the Act's 120-year history has revoked protections from commercial exploitation and activities for all of the objects within an entire national monument, as President Trump purported to do in 2021 and again here. The commercial fishing prohibition is fundamental to the proper care and management of the Monument objects identified in the 2016 and 2021 Proclamations.

111. The President has no constitutional or statutory authority to dismantle a national monument reservation in this manner. The President lacks authority to do piecemeal what he lacks authority to do outright. Otherwise, the President could peel away the protections provided by a national monument one-by-one until nothing was left.

112. The 2026 Dismantling Proclamation did not mention NMFS's existing regulations prohibiting commercial fishing in the Monument.

113. On April 6, 2026, NMFS issued the Rescission Rule, which rescinded the regulation banning commercial fishing in the Monument. 91 Fed. Reg. at 17159. The Rescission Rule purported to "merely conform[] U.S. fishing regulations to the requirements of the Antiquities Act and [the 2026 Dismantling Proclamation]." *Id.*

114. NMFS did not release a proposed rule or advanced notice of proposed rulemaking before issuing the Rescission Rule. The Rescission Rule stated that it was effective April 3, 2026, three days before its publication in the Federal Register.

115. NMFS did not solicit public comment on the legality or impacts of rescinding the commercial fishing prohibition in the Monument.

116. In the Rescission Rule, NFMS claimed there was "good cause" to waive notice and comment on its action. 91 Fed. Reg. 17159 (citing 5 U.S.C. §§ 553(b)(B) and 553(d)(3)).

117. NMFS stated that because the Rescission Rule was issued only to "conform to the [2026 Dismantling] Proclamation," the rule was "not discretionary, making the opportunity for prior public comment unnecessary because NMFS has no ability for public comment to inform decision-making." 91 Fed. Reg. 17159.

118. Nowhere in the Rescission Rule did NMFS discuss how it would ensure that commercial fishing was "appropriately managed," so as to "not put the objects of historic and scientific interest that the monument protects at risk." *See* 2026 Dismantling Proclamation, 91 Fed. Reg. at 6489. Nor did NMFS address compliance with any other environmental or land management statute, despite the 2026 Dismantling Proclamation clearly stating that the agency's management of the Monument was "subject to" a variety of protections from at least ten other laws. *See id*. Instead, the Rescission Rule merely rescinded the regulations at 50 C.F.R. § 600.725(x) without mentioning what management measures would govern the Monument area or discussing whether those measures were appropriate and consistent with all applicable laws.

119. NMFS did not engage in any NEPA analysis in connection with the Rescission Rule. NMFS asserted that NEPA "does not apply to this action" because the agency "has no discretion." 91 Fed. Reg. at 17159-60. NMFS did not address

whether the Rescission Rule was a major Federal action that may significantly affect the quality of the human environment.

## III. Commercial fishing harms the objects of historic and scientific interest in the Monument

### A. The threats commercial fishing poses to the Monument

120. The Monument's objects of historic and scientific interest are acutely vulnerable to damage caused by commercial fishing. Commercial fishing gear historically used in this area have included bottom and midwater trawls (e.g., for mackerel, squid, and butterfish), traps and pots (e.g., for lobster and crab), and pelagic longlines (e.g., for tuna and swordfish). In past periods when commercial fishing was permitted in the Monument, such fishing was limited, but ecologically meaningful, in part because of the high vulnerability and uniqueness of the Monument's marine life. Fishing occurred in particular in the Canyons Unit, with trawling and lobstering occurring in its shallower depths, red crab fishing concentrated somewhat deeper, and longlining occurring throughout.



*Fig. 5: Fishing gear types, clockwise from top left: (1) bottom trawl, (2) traps and pots, (3) pelagic longline, (4) midwater trawl*
*Credit: NMFS, "Bycatch: Fishing Gear and Risks to Protected Species," at https://perma.cc/73RP-GGTS; https://perma.cc/E5W6-5C9G; https://perma.cc/NF3C-2BPC; https://perma.cc/7VML-QLJU.*

121. One pass of a large, weighted bottom trawl net or one retrieval of a lobster or red crab trawl (which can span 1-2 miles in length with 35-150 traps attached by a groundline) can destroy corals, sponges, and anemones. Such gear poses a particular threat to deep-sea corals. Deep-sea organisms, like corals, do not propagate easily and tend to have longer lifespans and slower growth rates than their shallow-water counterparts—often just millimeters per year, sometimes over the course of hundreds or even thousands of years. As a result, damage to corals from even a single disturbance could take centuries to recover, if ever.

122. Commercial fishing's damage to the seafloor has broader repercussions and can significantly affect the web of interactions between species. Benthic

fauna—including deep-sea corals, sponges, and anemones—create the foundation for the deep-sea ecosystem, providing food, spawning habitat, and shelter for an array of fish and invertebrate species. Bottom trawl nets can prevent the growth of new colonies, including regrowth where corals had been destroyed. Other fishing gear types that contact the sea floor, such as heavy offshore lobster and crab traps and pots, are also known to impair and destroy these habitats. Further, trawls, traps, and pots can degrade bottom sediments and important habitat structure, like cobble, and harm organisms that live in these habitats.

123. Higher in the water column, commercial fishing removes large schools of fish and squid. Animals further up the food chain—like certain marine mammals, sharks, and seabirds—rely on both for survival.

124. Commercial fishing gears also inadvertently catch, injure, and kill non-targeted species—a phenomenon called "bycatch."

125. For example, pelagic longlines—which average 28 miles long and can have thousands of baited hooks intended to catch large fish such as swordfish and tuna—catch other marine wildlife such as whales, dolphins, seabirds, sea turtles, and non-targeted sharks and other fish. Even with gear modifications, it is not possible to eliminate all potential bycatch. Further, the vertical lines that connect heavy lobster traps and crab pots on the bottom to surface marking buoys can entangle whales and sea turtles, often fatally.

126. Commercial fishing gear is frequently lost or abandoned in the ocean, causing bycatch and entanglement in so-called "ghost gear."

127. Commercial fishing also brings with it increases in vessel traffic, resulting in additional underwater noise and increased risk of vessel strikes for species within the Monument.

128. Scientific evidence demonstrates that quiet ocean areas can act as acoustic refugia for certain species because they support vital biological functions. For example, in Cape Cod Bay, these opportunity areas have been shown to improve whale health and behavior (increased socializing and mating) otherwise disrupted by vessel traffic noise. And in the Bay of Fundy, after September 11, 2001, when shipping nearly ceased, a study demonstrated a decrease in faecal stress-related hormones in North Atlantic right whales. Animals that use echolocation to find prey also have an easier time foraging without acoustic interferences.

129. The harms identified above in Paragraphs 121 to 128 can cause damage outside of the immediate vicinity where the fishing occurs. This is because of the strong interconnectedness of the species and habitats that make up the ecosystems within the Monument. These interconnecting ecosystems reach from the seafloor to the ocean's surface in the Monument, and from the rims of the canyons down to the deep continental slope. As explained above in Paragraphs 72 to 78, the steep walls of the canyons and seamounts help create upwelling through complex movement of water, which contributes to nutrient cycling, thereby creating areas of immense biological productivity. Commercial fishing can disrupt the connections within the ecosystem by removing or damaging key species in ways that have far reaching effects.

130. In other words, harm from commercial fishing in one area of the Monument can lead to cascading harms throughout the ecosystem, reaching areas both laterally and vertically beyond the immediate point of fishing. Similarly, impacts to one species can lead to changes in the populations, movement, and behavior of other species. For example, commercial fishing for squid or mackerel can remove many thousands of fish in one tow, which can have deleterious effects on their predators (e.g., sharks, tuna, billfish, and whales). Removing apex predators like tuna and sharks can have cascading effects throughout the local food web.

131. Even limited amounts of commercial fishing can adversely affect the species, habitats, and ecosystems within the Monument. For example, harvesting the large, mature reproductively viable female lobsters that thrive in this cold-water refuge can disproportionately impact future year classes of lobster and compromise the species' ecological role, not just in the Monument but across Georges Bank and other nearby shallows.

132. By prohibiting commercial fishing, the 2016 and 2021 Proclamations protected the Monument's ecosystems and species from the harms described above, including destruction and adverse modification of habitat; bycatch of non-target species (including seabirds, turtles, whales, and dolphins); entanglement of marine mammals and other species; disturbance of fish foraging, breeding, nursery functions, and other essential activities; removal of fish prey; and noise pollution—all of which harm the objects of historic or scientific interest within the Monument.

133. Existing fishing regulations and fishery management plans other than those imposed through the 2016 and 2021 Proclamations and the Fishing Prohibition Rule do not adequately protect the Monument's objects of historic or scientific interest from the harms of commercial fishing. Those regulations and management plans were not promulgated with the protection of the Monument's objects of historic or scientific interest as paramount, as required by the Act. In other words, neither NMFS nor the fishery management councils considered as part of their deliberations the specific question of what restrictions were needed to protect all the objects of historic or scientific interest named in the 2016 and 2021 Proclamations.

134. Although there are some restrictions on the use of bottom gear in the Monument, none target the fishing activity that occurred there historically or prevent commercial fishing currently occurring there. There are no restrictions on the use of red crab pots in the Monument. *See* 50 C.F.R. § 648.373(a)(1). Lobster fishing can occur anywhere above 600 meters, *see id.* § 648.373(a)(1)-(2), and such fishing historically has occurred only at these shallower depths in the unique habitats found there. Although there are additional restrictions for Oceanographer and Lydonia Canyons, other types of bottom-tending gear including bottom trawling are allowed above 600 meters everywhere else in the Monument's Canyons Unit, including Gilbert Canyon. *See id.*; *see also id.* § 648.297 (additional Lydonia and Oceanographer Canyon restrictions). And even the additional restrictions above 600 meters for Oceanographer and Lydonia Canyons still allow bottom trawling at

depths where such fishing would be expected. *See id.* § 648.297. In fact, without the Monument's commercial fishing prohibition, those separate bottom gear regulations apply to less than half of the Monument's Canyons Unit. Lobster traps, crab pots, and bottom trawling can harm marine life on the sea floor and remove large numbers of targeted species, as well as other marine life. The vertical lines that connect lobster traps and crab pots can entangle whales and other marine mammals, sea turtles, and seabirds—often fatally.

135. The existing regulations also allow virtually all types of commercial fishing in the Monument's water column, including midwater trawling and longlining. *See* 50 C.F.R. § 648.373(a)(1) (restricting only "bottom-tending gear"). Longlines and midwater trawls result in bycatch and remove large numbers of targeted species (large, predatory fish like swordfish, tuna and sharks in the case of longlines, and small fish, like squid, relied on as forage by many species, in the case of midwater trawls). Put another way, the existing regulations allow the types of fishing that historically occurred in the Monument and that pose extant threats to its scientific and historic objects—the same threats that the commercial fishing prohibition in the 2016 and 2021 Proclamations intended to alleviate.

136. While prohibiting commercial fishing in a specific area has ecological and scientific benefits, there is no evidence that the commercial fishing prohibition has economically harmed the fisheries that historically operated in the Monument area, given that fishermen are generally able to move their effort elsewhere. Indeed, for example, the three canyons protected in the Monument are among the 40 shelf-

breaching canyons along the U.S. Atlantic coast. According to U.S. government data, average landings (i.e., quantity of fish caught and sold) in the New England and Mid-Atlantic squid, mackerel, and butterfish fisheries *increased* 24 percent in 2017-2024 compared to the previous eight years. (That figure excludes the two years, 2020-2021, when the fishing prohibition was lifted.) Overall revenues increased 52 percent during this same time period (2017-2024). In Rhode Island, which has the ports most proximate to the Monument, landings of squid, mackerel, and butterfish increased 39 percent and revenues increased 66 percent in 2017-2024 (again excluding 2020-2021) as compared to the 2009-2016 time period before the Monument was created.

137. Meanwhile, overall landings of the principal tuna stocks (bigeye, yellowfin, and bluefin) and swordfish in the highly migratory species commercial fishery in the New England and Mid-Atlantic regions did not meaningfully change in 2017-2024 (excluding 2020-2021) compared to 2009-2016. Overall revenues from tuna and swordfish catch in the fishery also remained essentially unchanged during this time. A 2022 peer-reviewed technical journal article similarly found no evidence of negative economic impact on any of these fisheries when examining location of fishing activity and distance traveled to fish.

138. The red crab and lobster fisheries were allowed to continue fishing in the Monument until September 15, 2023, pursuant to a seven-year sunset period. Almost all red crab landings between 2015 and 2021 were from outside the Monument. The same was true of the overwhelming proportion of lobster fishing

between 2015 and 2022. In addition, according to NOAA's quota monitoring reports, the red crab fishery landed nearly identical amounts (approximately 80-percent of quota) in the 2020 Fishing Year when red crab fishing was allowed in the Monument as it did in the 2025 Fishing Year when it was prohibited. Notably, landings in this fishery have been consistently below the total allowable limit, as "market conditions driv[e] landings more than th[e] limit." 88 Fed. Reg. 83893, 83894 (Dec. 1, 2023).

### B. Prohibiting commercial fishing is important to scientific research in the Monument

139. The Monument's geographic complexity and location, including that it encompasses a complete section of the shelf edge to deep-sea marine habitat, makes the Monument an important scientific reference site for studying multiple marine life communities and habitats, including deep-water corals and large marine mammals, like beaked whales. But the Monument's potential for research is greatly diminished with commercial fishing and can serve as a reference site only if the commercial fishing ban is reinstated.

140. Numerous scientific studies have been conducted in the Monument since its designation in 2016.

141. Since November 2017, researchers from the New England Aquarium have conducted at least twenty-five aerial scientific surveys of the Monument. During these surveys, researchers have observed and documented an extraordinary amount of marine life inside the Monument, including seven species of fish, sharks, and rays; and seventeen species of marine mammals such as different species of

dolphins, beaked whales, pilot whales, humpback whales, fin whales, sperm whales, and sei whales. Researchers have observed a broader range of species on each flight than they see elsewhere. Particularly noteworthy observations include the rarely sighted True's beaked whale, whale sharks, two blue whales in two separate years (the largest animal species that has ever existed and one that is rarely spotted in ocean waters near New England), and a high percentage of dolphin and whale mothers accompanied by calves and juveniles.



*Fig. 6: Fin whale swimming inside the Monument*
*Credit: New England Aquarium, November 12, 2017*



*Fig. 7: Sperm whale swimming inside the Monument*
*Credit: New England Aquarium, October 25, 2019*



*Fig.* 8: *Blue whale swimming inside the Monument*
*Credit: New England Aquarium, February 27, 2026*

142. NOAA has conducted or participated in at least five scientific expeditions within the Monument since its designation. NOAA broadcast two of these expeditions live to the public. NOAA's expeditions included visiting areas that had not been previously surveyed or explored, including parts of Gilbert Canyon, Oceanographer Canyon, Bear Seamount, and Retriever Seamount. Scientists documented high biomass and high diversity, novel behaviors and ecological interactions, and potentially new species on these trips.



*Fig. 9: Pink Coral on Retriever Seamount*
*Credit: NOAA Ocean Exploration, September 2019*

143. During a September 2018 submersible expedition to the Monument, Woods Hole Oceanographic Institution scientists discovered two previously unknown species of deep-sea corals in Lydonia Canyon. The new species are types of "bubblegum corals," so called because they have soft bundles of brightly-colored polyps that resemble wads of bubblegum along their branches.



*Fig. 10: ~100-year old Bubblegum coral (Paragorgia arborea) on Retriever Seamount. Credit: NOAA Ocean Exploration, July 2021, https://perma.cc/5DVZ-KVRP*

144. As recently as August 2026, on an expedition on the *R/V Connecticut*, scientists from several research institutions conducted sampling in Oceanographer and Lydonia Canyons and Bear Seamount. The expedition was live-streamed to shore multiple times. The scientists used baited remote cameras to observe apex predators, such as tiger and hammerhead sharks, and conducted seabird surveys, plankton net tows, eDNA sampling, hydrographic sampling to measure temperature and salinity along the surface, and split-beam sonar surveys to observe day-night vertical migration of organisms (e.g., krill). Another expedition has been proposed for next year if funding allows.

145. The commercial fishing prohibition is a core part of the Monument's protections and allows scientists to conduct research that they otherwise could not. Because commercial fishing is widespread in the Atlantic Ocean and has wide-ranging effects, almost all data that scientists collect there reflects some impacts from commercial fishing. As a result, scientists conducting research in the Atlantic cannot easily study whether differences they observe in species behavior or environments are due to commercial fishing pressure or other changes (such as higher ocean temperatures). Thus, the commercial fishing ban that began in 2016 has allowed the Monument to be a valuable reference site and scientific control area for studying specific marine life and the ecology of offshore areas (including for biodiversity-rich canyon and seamount areas specifically), as well as regional changes to such wildlife and attributes like ecological productivity associated with climate change. Studying the ecology of the Monument as a site without commercial fishing can also answer important research questions about ecosystem productivity, which can inform policy decisions about ocean resource management elsewhere.

146. Restoring the commercial fishing prohibition would make the Monument the only area extending from the shelf edge to the deep sea in the U.S. Atlantic completely protected from the harms of commercial fishing. This large area serves as a spawning and nursery refuge for a range of fish and invertebrate species that would, over time and if protected from commercial fishing, support higher densities of such species; ultimately allowing scientists to better understand the relationships between fish productivity and fishery disturbances. Restoring the

commercial fishing prohibition would also allow the Monument to continue to be a refuge where marine mammals and other animals can forage, congregate, raise young, and engage in other essential behaviors free of disturbances and risk of harm.

147. As a biodiversity hotspot, the Monument can support a wider array of species than is seen elsewhere. Surveying and sampling in the Monument allows scientists to view this wider array of species—including some that have yet to be seen in other areas—and observe interactions between species and the environment they otherwise could not. Commercial fishing has the ability to alter the species composition in the Monument, as well as the age and size structure of species' populations, and thus negatively impact scientific research.

148. The commercial fishing ban also contributes to the abundance of different species found in the Monument, including benefits for managed fish stocks. Studies have found that fish and crustacean abundance, as well as size/age, in marine protected areas can be significantly greater on average than in fished areas. A growing body of empirical evidence suggests that some of this increased biomass can have spillover benefits to adjacent areas as well.

149. The 130-mile distance from shore has limited recreational fishing in the Monument. Further, recreational and commercial fishing gear are different in ways that make recreational fishing's impact on habitat, volume of fish removed, and the incidence of bycatch species injured or killed substantially less by comparison. For example, a recreational fishing line targeting tuna or swordfish

may contain two or three hooks, but a commercial longline (averaging 28 miles in length) can contain several thousand hooks and injure and kill sea turtles, dolphins, and several species of small whales. Another example is a vessel operating in the squid fishery that uses a large net with a very small mesh size, thus indiscriminately catching large quantities of non-target species that cannot escape and are ultimately discarded. Recreational fishing is also not capable of removing entire schools of fish or depleting prey in the same way as commercial fishing. Although scientific efforts to understand the impacts of human disturbance on marine ecosystems would benefit from areas free from all fishing, the presence of recreational fishing under these circumstances does not negate the Monument's scientific value as a reference site.

### C. Resumption of commercial fishing in the Monument harms Plaintiffs' interests

150. Plaintiffs and their members plan to continue to view, study, and enjoy the unique habitats, fish, marine mammals, seabirds, corals, and other marine species that are objects of historic or scientific interest protected by the Monument designation and the Fishing Prohibition Rule.

151. The prohibition on commercial fishing within the Monument—set by the 2016 Designating Proclamation, 2021 Restoration Proclamation, and Fishing Prohibition Rule—benefited Plaintiffs and their members by enabling them to use and enjoy the ecosystems and marine life in and around the Monument area for professional, scientific, educational, aesthetic, and recreational purposes without

disturbance or harm from commercial fishing. Resumption of commercial fishing under the current fishery management plans and regulations harms those interests.

152. Conservation Law Foundation (CLF) has thousands of members that use and enjoy fish and other marine resources off the New England coast for recreational, aesthetic, educational, and scientific purposes.

153. CLF's members have a particular interest in the protection of ecologically important areas in the ocean, like the Monument, because large marine protected areas increase the ocean's resilience to climate change, preserve biodiversity, and serve as scientific reference sites.

154. CLF's members include professional scientists who have been studying the habitats within, and many of the species associated with, the Monument and nearby areas.

155. One such CLF member is Peter Auster, Ph.D., a scientist who specializes in marine ecology. He is a Research Professor Emeritus of Marine Sciences at the University of Connecticut, where he has held multiple positions since 1979, and a Scientist in Residence at Mystic Aquarium, where he has worked since 2011. He serves or has served on multiple regional, national, and international committees that advise agencies regarding ocean conservation and management.

156. For over 40 years, Dr. Auster has conducted studies to define how variation across underwater landscapes mediates the distribution and abundance of fishes as well as associated species (e.g., structure forming species such as corals,

and prey species such as herring and mackerel); understand the linkages between habitat-level processes and population-community dynamics; and develop survey methods for animals living in spatially complex habitats. Dr. Auster's research also focuses on understanding the ecological impacts of human uses of the sea and developing a scientific basis for using marine protected areas as a conservation tool. Even though he has engaged in this research for decades, the Monument's protections provide new and exciting avenues for Dr. Auster to study how ecosystems function in the absence of direct human-caused disturbances from commercial fishing.

157. Dr. Auster has extensively studied the canyons and seamounts area that the Monument encompasses. Dr. Auster has led or participated in multiple research expeditions—including those using a human-occupied vehicles (HOV) or remotely operated vehicles (ROV)—to all three canyons and four seamounts within the Monument. He has conducted research within the Monument both as a ship-based and shore-based research participant. He has also utilized and intends to continue to utilize data and samples that have been and will be collected in the Monument by other scientists and agencies in his shore-based research.

158. The Monument has been the only highly protected area in the U.S. Atlantic along the continental shelf margin where Dr. Auster can observe and study ocean wildlife interactions, including between different ocean depths, in the absence of direct pressures from commercial fishing. His research on ecological interactions

writ large requires data from relatively undisturbed communities and habitats that span from the sea floor, throughout the entire water column, and to the surface.

159. Dr. Auster's ongoing and future research in the Monument includes three research pathways. First, he seeks to understand the basic linkages between species, and species and their habitats, to describe the natural (undisturbed) web of ecological complexity in the Monument specifically as a place free from commercial fishing pressures. Second, he seeks to understand the impacts of commercial fishing on relatively undisturbed fish populations and seafloor habitats by using longitudinal studies (i.e., collecting long-term time series data) that return to a set of sites inside and outside the Monument to study the recovery of the diversity and species composition in seafloor communities in places impacted by commercial fishing and those that are protected, with the Monument serving as an unimpacted reference site. Third, he seeks to use long-term time series data from NOAA trawl surveys along the upper continental slope, inclusive of the Monument region, to compare and contrast decadal changes in fish community composition and species abundance. In addition to using data obtained from past and future cruises, Dr. Auster will attend future cruises to the Monument if opportunities arise.

160. Dr. Auster was part of the expedition-planning team for the 2019 NOAA Ship *Okeanos Explorer* cruise to the region, which conducted four dives in the Monument, including one in the head of Oceanographer Canyon, which furthered his second line of research. The results of this latter dive revealed disturbance to seafloor features and species distributions (e.g., collapsed and piled

cohesive sediments) that could have been due to natural processes or the impacts of fishing gear. The uncertain causes clarified the need to compare and contrast the benthic fauna there with similar communities outside the Monument.

161. Dr. Auster also led the 2024 *R/V Connecticut* expedition to the Monument in partnership with U.S. Fish and Wildlife Service, NOAA, Yale University, University of Rhode Island, University of Connecticut, and Mystic Aquarium, which furthered his first line of research. His research used baited remote underwater video cameras to sample apex predators in surface waters and diving in pelagic waters ("bluewater dives") to assess small forage species and their use of gelatinous and related species as habitat in the midwater column. This expedition was one of the first to focus exclusively on how communities of marine wildlife operate in the absence of significant direct human impacts.

162. Consistent with his second and third lines of research, Dr. Auster was a principal researcher planning the 2026 *R/V Connecticut* expedition to Oceanographer and Lydonia canyons and Retriever and Bear Seamounts. Although he was unable to sail on this expedition due to an unforeseen medical issue, his work was implemented by colleagues and collaborators aboard the ship. Using data from this cruise, Dr. Auster will focus on the assessment of diversity and distributions of apex predators (e.g., sharks) and study of variation in the day-night distribution of vertical migrating species (e.g., small aggregating pelagic fish, squid, and krill) in the Monument.

163. Dr. Auster has seen first-hand the destruction that commercial-scale bottom trawl, bottom-longline, and trap/pot fisheries can cause to benthic habitats and species composition in the Northeast region and he has assessed the potential scope of impacts from these gear types in the Monument. Opening the Monument to commercial fishing threatens the species, communities, habitats, and their ecological interactions that Dr. Auster depends on for his research and personal enjoyment.

164. Dr. Auster's research will be harmed by introducing the confounding human influences of commercial fishing, such as depletion of fish or damage to corals, by introducing scientific uncertainty. For example, it impairs his understanding of whether coral reproduction (production of gametes or larvae) and subsequent survival and growth of those larvae is altered because of human fishing pressures or other environmental factors. Understanding where corals will survive and thrive has implications for managers when developing management measures to protect deep water corals and essential fish habitat.

165. Dr. Auster's ability to use the Monument as a protected area where he can compare and contrast fished and unfished communities will be harmed by commercial fishing. He can no longer contrast seafloor and midwater communities subject to fishing pressure outside the Monument with those protected inside (e.g., based on species composition, behavioral interactions, growth and reproduction). The nature of his research is not static and commercial fishing will harm his ability to pursue multiple lines of research in this controlled study area.

166. Allowing commercial fishing in the Monument also harms Dr. Auster professionally by directly affecting his ability to construct a competitive proposal based on the controlled study area and secure dedicated funding for these types of research opportunities.

167. Dr. Auster's research in the Monument will be diminished to varying degrees depending upon the extent of commercial fishing that occurs. Because Dr. Auster's research occurs in the ocean, and not in a laboratory, complete isolation of the factors that cause particular changes he observes in marine ecosystems is impossible. This is why a complete prohibition on commercial fishing will greatly benefit Dr. Auster and his research—it removes a critical variable affecting the marine environment. In this way, commercial fishing has meaningful and detrimental physical and ecological impacts and harms his research by introducing scientific uncertainty into his research and the conclusions he can draw.

168. In addition to research studies, Dr. Auster simply enjoys observing marine wildlife that he has spent his career understanding how to conserve. Dr. Auster has a strong personal interest in observing marine life there and particularly enjoys the experience of being in a protected marine wilderness, where he can experience things like pods of dolphins, whales, seabirds, and tunas chasing and feeding on small fish and squid at the surface. In addition to impacts on his research, opening the Monument to commercial fishing will prevent Dr. Auster from being able to see, experience, enjoy, and study relatively undisturbed species and communities in the Monument.

169. Another CLF member is Dr. Rhian Waller, Ph.D., a scientist who specializes in invertebrate reproduction, deep-sea biology, and cold-water corals. Dr. Waller is a Professor at the University of Gothenburg's Tjärnö Marine Laboratory, Sweden, where she has worked since 2022. She has held multiple positions since 2003, including Associate Professor at the School of Marine Sciences with the University of Maine. Dr. Waller serves on numerous national and international committees and currently serves as a member of the editorial board for the Journal on Invertebrate Reproduction & Development and Associate Editor for Frontiers in Marine Science – Deep-Sea Environments and Ecology.

170. For over 25 years, Dr. Waller has studied the reproduction and development of cold water, deep-sea invertebrates from around the globe, and how these animals are affected by both natural and anthropogenic environmental change. Her current research examines how deep-water corals and sponges survive and thrive to create healthy ecosystems in waters from a few meters to over 6000 meters deep and from the Atlantic, Pacific, and Southern Oceans. Dr. Waller's research relies on direct sampling, submersible observations, and long-term biological datasets to address fundamental questions about reproduction, biodiversity, and growth in vulnerable, cold-water, deep-sea species.

171. Dr. Waller has conducted research along the broad network of Northwest Atlantic canyons and seamounts in the area that now encompasses the Monument for decades. She has observed that the geological features within the Monument interact with ocean currents to generate upwelling events and other

dynamic oceanographic processes that result in a particularly rich abundance and diversity of marine species in this area as compared to others along the same chain. The fishing prohibition benefited Dr. Waller's research by allowing her to conduct her research with increased confidence (less scientific error around unknown variables) that her samples and data were being harvested in a relatively stable environment (without commercial fishing stressors) and that the cold-water corals she studies were reproducing under natural conditions.

172. Dr. Waller started working in the Monument area as a U.S. Geological Survey postdoctoral scholar at the Woods Hole Oceanographic Institution. For over 20 years, her research has relied on samples collected by NOAA and others within the area that is now the Monument.

173. Dr. Waller has led or participated in six research expeditions in the Monument using a HOV or ROV to study deep-sea coral communities on Bear, Physalia, Mytilus, and Retriever Seamounts and in Oceanographer Canyon. From 2003 to 2005, she visited the Northeast Canyons and Seamounts on three research cruises, including via a submersible (HOV and ROV) with the *R/V Atlantis* and the NOAA Ship *Ron Brown*, studying biodiversity and connectivity and helping construct the original database that is now the NOAA Deep Sea Coral Data Portal (i.e., NOAA's national database of deep-sea coral and sponge observations). These cruises provided the opportunity to collect corals from different sites for direct comparisons. In 2014, Dr. Waller participated remotely in the NOAA Ocean Exploration expedition to the Northeast Seamounts and Canyons from a virtual van

(University of Rhode Island). And in 2021, Dr. Waller served as the Chief Scientist for the NOAA Ocean Exploration expedition on the NOAA vessel *Okeanos Explorer*; this cruise included the shallowest dive to date on a pinnacle on Retriever Seamount and in an unexplored area. The results of that dive uncovered at least 29 species of deep-sea coral, including exceptionally large colonies of black corals and bubblegum corals aged at least 100 years old and bamboo coral that may date around 1,600 years old.

174. Dr. Waller is currently studying the reproductive strategies and ecological role of the bubblegum coral *Paragorgia arborea* and the red tree coral *Primnoa reseadiformis* and plans to continue collaborating with NOAA colleagues and others to obtain samples from the Monument. Studying their reproductive processes requires long-term biological data sets to fully understand cause and effect, and the Monument has provided varied ecological niches and in some cases species that are undocumented elsewhere. The Monument provides a rare opportunity to sample these intact, deep-sea coral communities repeatedly over time.

175. Dr. Waller plans to continue this research and is actively relying on samples collected within the Monument. For example, she received samples in 2024 from colleagues at NOAA and the Smithsonian Museum of Natural History (collected during a collaborative expedition with Canadian scientists). The results of this research, comparing bubblegum coral in the Monument to species around the globe, will be presented at the International Symposium on Deep-Sea Corals in

November 2026. Dr. Waller plans to continue analyzing 2024 coral samples from the Monument for her spatial and temporal studies on reproduction and development and working on ROV videos for biodiversity analysis. Dr. Waller expects to receive and analyze additional samples of deep-sea corals and sponges from future expeditions.

176. The hundreds- and thousands-year-old coral colonies that Dr. Waller studies are extremely vulnerable to any disturbance, including from commercial fishing. Dr. Waller has seen the impacts from commercial fishing firsthand that are still visible many decades later. In the absence of a fishing prohibition, she is concerned that similar gear impacts (including impacts from lost fishing gear and sedimentation from nearby fishing) in the Monument will increase.

177. Commercial fishing threatens her ability to study vulnerable deep-sea coral communities over time. For example, her research on the reproductive strategies of deep-sea coral species requires securing multiple samples over a long time period to assess inter-annual variability (e.g., some years could be more impacted by climate patterns and ocean temperatures than others). Commercial fishing causes disturbances to the ecosystem and harms Dr. Waller's research by jeopardizing sampling continuity, compromising her ability to study the reproductive nature of a population and determine the stages of reproduction. Commercial fishing anywhere in the Monument can disturb ecological connections between those populations with high reproductive rates that serve as a source of larvae, which may prevent coral populations elsewhere from thriving, which has

downstream ecosystem impacts. It will also reduce Dr. Waller's ability to rely on the Monument as a long-term reference site, because disturbance or loss of coral colonies from commercial fishing activity would eliminate the stable conditions necessary to determine when coral reproduction is occurring naturally.

178. Commercial fishing in the Monument also harms Dr. Waller's professional interests by reducing her opportunities for dedicated funding and ship time resources for research and therefore increasing uncertainty around sampling collection opportunities in this area. Restoring the Monument's protections would preserve its research value and likely result in continued, dedicated resources to conduct her research in this area.

179. Commercial fishing in the Monument also harms Dr. Waller's aesthetic interests. From her decades of research, she particularly enjoys seeing storm petrels, terns, sperm and pilot whales, and Mola mola when visiting the Monument. Below the waters' surface, she finds it amazing to witness thousands and hundreds years-old corals and sea stars while participating in submersible operations. She has found when transiting the entire seamount chain that the Monument's waters are uniquely rich in biodiversity, including areas teeming with life and densely packed with deep-sea organisms from the seafloor to the ocean surface. She continues to tune in to live streams to enjoy witnessing deep-sea corals, such as bubblegum and red tree corals, as well as the spiral and umbrella shaped corals *Iridogorgia* and *Metallogorgia*, even when she is not on board a ship. The

Monument's commercial fishing ban protects the species she enjoys seeing and plans to continue to tune in to see.

180. The Natural Resources Defense Council (NRDC) has members who are scientists, educators, and bird- and wildlife-watchers and who use the area in and around the Monument for research, education, wildlife viewing, and aesthetic appreciation.

181. One such NRDC member is Dr. Mary Beth Decker, a biological oceanographer and marine ecologist whose research focuses on open-ocean (pelagic) ecosystems, including the distribution and abundance of animals in the food web above the ocean floor. Dr. Decker is a research scientist at Yale University, where she conducts marine science research and teaches courses addressing marine ecosystem function, climate change, and conservation. She also incorporates information about real-world marine protected areas into her teaching and public outreach. Dr. Decker specializes in gelatinous zooplankton, such as jellyfish and salps, and their interactions with plankton, forage fish and higher-level marine predators, such as commercially important fish species.

182. The Monument's protections have enabled Dr. Decker to pursue a line of research new to her that requires the Monument's commercial fishing ban to be reimposed and maintained in the long term: studying biodiversity in pelagic ecosystems in protected areas closed to commercial fishing, including what species are found, and in what abundance. In this regard, the existence of a highly protected area without commercial fishing is essential to her research. This is

because commercial fishing has been shown to alter the type and number of species and their abundance in an ocean area. Studying an area without commercial fishing thus allows Dr. Decker to observe the ecological roles of (or ecological interactions among) species she may not otherwise be able to see, which she hopes will facilitate new scientific understandings about how ocean ecosystems work. She also uses and plans to use the underwater recordings she captures from the Monument in classes she teaches both for pedagogical purposes and to show her students the wonders of the Monument's ecosystem.

183. Dr. Decker's research also seeks to understand how marine ecosystems are changing over time in response to natural environmental variability and human-induced climate change. Commercial fishing makes it harder for Dr. Decker to know whether differences she observes over time are from fishing pressures versus other environmental factors. Thus, Dr. Decker is studying and plans to continue to study an ecosystem closed to commercial fishing to better isolate other effects. Dr. Decker would also like to compare data collected from a site closed to commercial fishing to a similar one open to such fishing to understand the effects of commercial fishing. Thus, having a protected area in which to survey and collect samples is critical to the research questions Dr. Decker is trying to answer.

184. Because of the pervasiveness of commercial fishing, the Monument is the only site known to Dr. Decker in the U.S. Atlantic from which she can collect samples and data on the ecosystem of an area closed to commercial fishing. Dr.

Decker has collected and seeks to continue to collect samples from both the Canyons Unit and the Seamounts Unit.

185. In July 2024, Dr. Decker participated in a scientific research expedition to the Monument. This expedition provided Dr. Decker with her first opportunity to directly observe and conduct research in the Monument following its designation. On this trip, Dr. Decker collected data on species found in the Monument, including gelatinous species she had not encountered in nearby coastal waters, such as *Pelagia noctiluca*, a jellyfish also known as the mauve stinger.

186. Dr. Decker hoped to conduct future sampling and studies in the Monument to understand how environmental factors other than commercial fishing affect such ecosystems over time. Before NMFS issued the Rescission Rule, Dr. Decker planned to return to the Monument in significant part because it was an area free from commercial fishing, and did so in the summer of 2026. On her trip in August 2026, Dr. Decker saw gear, including large floats for pots, indicating that commercial fishing is occurring in the Canyons Unit.

187. Lifting the commercial fishing ban harms Dr. Decker's research and scientific interests by compromising her ability to complete her current research and conduct future research, by altering food-web structure. Dr. Decker cannot answer her original research questions that she intended the summer 2026 trip to help her answer—namely which fish, plankton, and other pelagic species are found in the type of areas found in the Monument that are free from the influences of commercial fishing. Answering this question requires sampling multiple sites over

long periods to account for, among other things, inter-annual (and even inter-decadal) variability in species composition. Absent a Monument-wide commercial fishing ban, Dr. Decker will not know whether the area she samples is truly free of commercial fishing. Such fishing can affect ecosystem composition beyond the immediate vicinity of where it occurs (as explained above in Paragraphs 129 to 131), and thus risks changing species composition, predator-prey relationships, and ecosystem dynamics before she can complete planned long-term sampling.

188. With the resumption of commercial fishing, Dr. Decker also cannot determine whether differences in her 2024 and 2026 data are caused by environmental factors other than fishing pressure. She also cannot use the 2026 data to compare with similar sites to determine the effects of commercial fishing.

189. These impacts on Dr. Decker's research harm her professionally by limiting the topics she can research and obtain grant funding for and making it more difficult for her to complete and publish papers on the research she had already planned. If the commercial fishing ban were reimposed, it would be easier for Dr. Decker to propose research questions and obtain research grants to go to and study the Monument due to it being a unique site.

190. Dr. Decker is aware of preliminary planning for a future expedition to the Monument and will pursue participation in that trip to continue her sampling efforts. However, with commercial fishing permitted at its current levels in the Monument, the data and samples Dr. Decker will collect are much less useful for her research. If the commercial fishing ban were restored, Dr. Decker would be

more likely to return to the Monument and resume her research, for the reasons stated above. Dr. Decker could also conduct additional research in the Monument if NMFS placed additional restrictions on commercial fishing, depending on the scope and nature of those restrictions. Other fishing restrictions could increase the likelihood of viewing different species in the Monument and would help her to isolate the impacts of commercial fishing, which would benefit Dr. Decker's research.

191. The lifting of the commercial fishing ban also harms Dr. Decker's aesthetic interests. While visiting the Monument, Dr. Decker has observed numerous marine mammals and seabirds within the Monument, including sperm whales, humpback whales, dolphins, and a diversity of seabird species. She observed these animals feeding and foraging in an environment free from the risks associated with commercial fishing gear. Dr. Decker also captured and viewed underwater recordings of the Monument's seafloor and its different habitats and species while visiting the Monument. She derives aesthetic enjoyment from seeing this abundance of species in the wild, finding it personally exciting to see so many species flourishing in their natural ecosystem. As an ecologist, Dr. Decker achieves a feeling of calm, peace, and amazement when viewing and appreciating an intact ecosystem like that in the Monument. She is concerned that commercial fishing in the Monument, if it persists, will damage the Monument's fragile ecosystems and degrade her experience of this special place. If the commercial fishing ban were

restored, Dr. Decker would likely visit the Monument again, which would benefit her aesthetic interests.

192. Another NRDC member is Dr. Scott D. Kraus, a marine biologist whose research encompasses the biology and conservation of marine mammals. Dr. Kraus's research and professional interests include understanding the effects of human activity on marine mammals, how to design effective protections for marine mammals from threats from human activities, and how marine mammal populations are changing in response to fishing pressures and climate change. Among other species, Dr. Kraus has studied and would like to continue research on bottlenose dolphins, common dolphins, and Risso's dolphins; sperm whales, Cuvier's Beaked whales, dense beaked whales, pilot whales, finback whales, humpback whales, blue whales, and right whales; loggerhead, leatherback and Kemps-Ridley sea turtles; ocean sunfish; manta rays; and whale sharks, all of which are found in the Monument. Dr. Kraus also engages in public education on these topics of professional interest.

193. The Monument has been and continues to be an important subject of Dr. Kraus's research. In particular, the Monument presented different and important research opportunities when the commercial fishing ban was in place. Dr. Kraus has personally conducted and continues to use data from ongoing aerial flight surveys that cover the entire Canyons Unit of the Monument for his research. Over his career, Dr. Kraus has personally participated in more than a dozen flights over the Monument area conducting aerial surveys of marine mammals; from 2017 to

2019 he directed a research team at the New England Aquarium collecting data within the Monument boundaries. Although Dr. Kraus is now retired from the New England Aquarium, he remains affiliated and continues to work with Aquarium researchers who conduct aerial surveys of the Monument. Dr. Kraus also continues to conduct and publish his own research.

194. Dr. Kraus plans to continue to use survey data that has been and will be collected from the Monument to analyze trends in marine mammal populations over time to understand how fishing and climate change affect them. This data will help scientists better understand human threats to marine mammals, which is essential to efforts to conserve those species, including by aiding research to identify measures to mitigate harms from human activities. Dr. Kraus relies on ocean areas that have become protected from commercial fishing to aid his study of the effects of both climate change and human activities on marine mammal populations. Without such areas, Dr. Kraus cannot determine whether changes observed in marine mammal populations are caused by commercial fishing rather than climate change. Dr. Kraus is also interested in comparing the Monument's survey data with survey data of other parts of the north Atlantic to understand the impacts of commercial fishing and shipping.

195. The Canyons Unit of the Monument is an ideal reference site for Dr. Kraus's research because it is a biological hotspot and an important migratory stop where scientists can observe an abundance of marine mammals and other marine species, including some rarely seen animals. Such stopovers have critical value to

migratory species. Survey data Dr. Kraus has collected and viewed shows that marine mammals congregate in the Monument to feed and spend a critical portion of their migratory life there, including for important events such as mating and raising young.

196. The Monument-wide commercial fishing ban renders the data collected from the Monument very valuable for use in Dr. Kraus's research. Prior to the challenged actions, the Monument's prohibition on commercial fishing made the Monument the only shelf-edge to deep-sea area fully protected from commercial fishing in the U.S. Atlantic. The loss of that protection compromises Dr. Kraus's ability to use the Monument as a reference site to isolate climate change's impacts on marine mammal populations in the Northwest Atlantic, and to assess how the absence of commercial fishing may impact marine mammal distribution, abundance, and behavior in and beyond the Monument. Accordingly, the lifting of the commercial fishing ban jeopardizes Dr. Kraus's ability to use this survey data from the Monument in his research and decreases the data's usefulness.

197. Quickly reimposing a commercial fishing ban in the Monument will help alleviate these harms. Because Dr. Kraus plans on looking at changes in survey data over a long period, it will still be possible to compare trends in data about marine mammals in the Monument and outside of it, including by accounting for acute disturbances from commercial fishing using modeling tools. Restoration of the commercial fishing ban would allow Dr. Kraus to continue to use data from the Monument in his research.

198. Allowing commercial fishing to continue indefinitely, however, would harm Dr. Kraus's climatological research by preventing him from using the Monument's survey data to study marine mammal population changes without confounding effects from commercial fishing, and would harm his professional, scientific, and research interests. Even small amounts of commercial fishing alter whale and other marine mammal behavior and populations due to loud vessel noises and use of sonar, removal of food sources (e.g., fish and squid), and risks of entanglement in gear such as bottom trawls, midwater trawls, and vertical lines from lobster traps and crab pots.

199. Dr. Kraus has additional scientific and aesthetic interests in the Monument beyond his research using aerial survey data. Dr. Kraus collaborates with other scientists to design studies such as conducting midwater sampling to understand the food chain in the Monument and what may be contributing to the Monument's unusual productivity. From his prior trips to the Monument, Dr. Kraus valued the opportunity to observe an extraordinary number of different species in the Monument, some of which (like manta rays) are not expected to be found in a northern climate. Dr. Kraus is excited by the immense possibility of discovery the Monument presents.

200. <u>Mr. Zack Klyver</u> regularly uses and plans to use in the future the waters of the northwest Atlantic Ocean to view, study, and educate others about marine wildlife, including wildlife that use the Monument as habitat and feeding ground, such as humpback, sperm, fin, and sei whales, and many seabirds,

including the population of Atlantic puffins that nest in the summer on islands near Bar Harbor and overwinter at sea in the Monument area.

201. Mr. Klyver has frequently traveled to observe marine wildlife in many different parts of the northwest Atlantic. He has led a whale and seabird boat tour to the nearby Hudson Canyon, and his company Flukes, Inc., is planning a tour in June 2027 on a boat named the Helen H. that will take guests to see whales and other marine wildlife in the Monument.

202. The commercial fishing prohibition benefitted Mr. Klyver's interests in viewing, studying, and educating others about these whales, marine wildlife, and seabirds: The Monument—if fully protected from commercial fishing—provides these species with a protected source of food, shelter, and passage for their migrations and movements. As a result, if the Monument's commercial fishing ban is reimposed and maintained in the long term, these species will likely continue to appear in the Monument in larger numbers, which, given the migratory and/or mobile nature of the species, increases the likelihood of viewing these species in the surrounding nearer-to-shore-areas.

203. The commercial fishing prohibition also facilitated scientific investigation and therefore provided Mr. Klyver with information to use when educating the public, commenting on agency decisions, and advising agency decision-makers about marine life in the northwest Atlantic Ocean, as he does frequently in his capacity as a naturalist and vice-chair of the Atlantic Herring Advisory Panel for the New England Fishery Management Council.

204. Center for Biological Diversity ("the Center") members and staff use the northwest Atlantic Ocean, including areas within and near the Monument, to view and study marine wildlife, including humpback, right, sperm, fin, and sei whales; loggerhead and leatherback turtles; sharks and other fish; and seabirds.

205. One such member of the Center is Zack Klyver, who is interested in the Monument and the protections the commercial fishing prohibition provides, and is harmed by the revocation of these protections as described above. Another Center member recreates in and near the Atlantic Ocean off Massachusetts each summer. She regularly swims and sails in the waters off Martha's Vineyard and enjoys visiting Cape Cod for camping and whale watching trips. While doing so, she looks for and enjoys seeing migratory species like sharks, dolphins, and fin whales that travel to and from the Monument area; as well as gulls and other seabirds and whale species, like humpback whales. She is also planning a trip to the Monument in summer 2027. She benefits from the Monument's commercial fishing prohibition because it provides important protections to a variety of marine life that make it more likely she will be able to view the sharks, whales, and seabirds she enjoys.

206. Together, the 2026 Dismantling Proclamation and Rescission Rule strip the Monument of the complete prohibition on commercial fishing that made it an important scientific reference site and refuge for marine life. The Rescission Rule results in fisheries in the Monument being subject to the same statutes, regulations, and fishery management plans that apply outside the Monument, despite the Monument designation still being in place.

207. Had NMFS solicited public comment or done NEPA review, Plaintiffs would have objected to NMFS providing no new protections for the Monument's objects of historic or scientific interest and provided information on why the existing restrictions are inadequate. With the benefit of this information, NMFS may have placed additional limitations on commercial fishing to protect Monument objects. Plaintiffs and their members suffer a procedural injury from NMFS's failure to follow notice and comment requirements or conduct NEPA review, which is tied to their professional, scientific, recreational, aesthetic, and environmental interests.

208. Opening the Monument to commercial fishing will likely result in increased vessel traffic and noise; bycatch and entanglement of marine mammals and other marine wildlife in fishing gear; disturbance of feeding and foraging seabirds, sea turtles, and marine mammals; damage to fragile and ecologically important deep-sea coral habitat; and deleterious alterations to the area's ecology and ecosystems, including the depletion of forage fish and the extraction of large numbers of other key fish species.

209. Commercial fishing in the Monument will likely harm endangered, threatened, and vulnerable species like whales, sea turtles, and puffins, by disrupting the areas on which they depend for overwintering, feeding, breeding, and migration, as well as injuring and killing animals directly. These impacts will adversely affect Plaintiffs' and their members' ability to view, study, and enjoy these vulnerable species in a relatively pristine, undisturbed habitat. Commercial fishing will also harm the health and beauty of the ecosystem in the Monument and

will thereby impede Plaintiffs' and their members' ability to study, view, and enjoy the Monument as the only large strongly protected ocean area off New England's shores.

210. Rescission of the ban on commercial fishing in the Monument harms the professional interests of Plaintiffs' members, including Dr. Auster, Dr. Waller, Dr. Decker, and Dr. Kraus, because they will no longer be able to use the Monument as a control and reference site for their research. Allowing commercial fishing throughout the Monument (regardless of where it ultimately occurs) prevents the Monument from being an effective reference site for studies that depend on collecting data from an area free from commercial fishing. Commercial fishing in the Monument will also disrupt biological processes and harm species that Plaintiffs' members study. As a result, scientists, including Dr. Auster, Dr. Waller, Dr. Decker, and Dr. Kraus, suffer harm to their professional interests by being unable to complete some studies they have already started, conduct planned future studies, or obtain grants for anticipated future research.

211. These harms from lifting the commercial fishing prohibition are already occurring and likely to continue unless the prohibition is reimposed. Several commercial fishing associations have asserted that their members used to fish commercially in the Monument. And in the previous period when the Monument was open to commercial fishing (2020-2021), such fishing occurred there, including by vessels using lobster and red crab pots and traps, longlines, and trawling.

Industry groups and companies have publicly applauded the rollback, with some stating an intent to fish within the Monument.

212. Now that Defendants have revoked the 2021 Restoration Proclamation and the regulations prohibiting commercial fishing, any commercial fishing boat with a valid license and fishery permit can fish inside the Monument; they need no additional agency approval or permits before doing so. Indeed, in the period since the 2026 Dismantling Proclamation and the Rescission Rule were issued, commercial fishing is already occurring within the Monument, in particular in the Canyons Unit, including fishing for lobster and red crab. And commercial fishermen have stated that they intend to fish in the Monument in 2026.

213. Plaintiffs' injuries would be redressed by the relief sought here.

214. Plaintiffs have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF
## *Ultra vires* action in excess of the authority under the Antiquities Act
## *(All Defendants)*

215. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

216. Judicial review is available to ensure that the President's actions are consistent with constitutional principles; that the President's actions are within the scope of his statutory and constitutional authority; and that the President's actions do not violate laws enacted by Congress.

217. The President has the authority to regulate federal lands only to the extent that Congress has delegated that authority to the President.

218. In issuing his proclamation of February 6, 2026, President Trump acted without authority under, and thus violated, the Antiquities Act, 54 U.S.C. § 320301. Under the Act, Congress authorized the President to "declare" national monuments and to "reserve" lands and waters for the protection of objects of historic or scientific interest, but not to undo such designations or abolish such reservations, in whole or in part. *Id.* § 320301(a), (b).

219. As a result, the 2026 Dismantling Proclamation was in excess of President Trump's delegated authority and contrary to the Act. By purporting to rely on the Act to do the opposite of what Congress empowered presidents to do, President Trump made an extreme error and acted entirely outside of the President's authority. The Proclamation is therefore *ultra vires* and unlawful.

220. The Act does not preclude review of a President's compliance with the statute. There is no alternative procedure for review of whether a President has exceeded his delegated authority under this statute.

221. Even if the President had the authority to remove monument protections—which he does not—the President's authority may be exercised only in a manner consistent with the terms of the Act, including the requirement for proper care and management of the objects of historic or scientific interest identified in the 2016 Designating Proclamation and 2021 Restoration Proclamation.

222. When President Obama issued the 2016 Proclamation designating the Monument, he described the objects of historic or scientific interest that warranted protection under the Act. He also determined that the prohibition on commercial

fishing was an essential component of such protection. President Biden's 2021 Restoration Proclamation agreed with these determinations.

223. The 2026 Dismantling Proclamation revoking the prohibition on commercial fishing deprives the Monument's objects of historic or scientific interest of the protections they had under the 2016 and 2021 Proclamations, leaving them vulnerable to the very damage that the Monument reservation was designed to avoid.

224. The 2026 Dismantling Proclamation is based on considerations outside the Act, lacks any adequate legal or factual justification, and is inconsistent with the proper care and management of the objects to be protected in the Monument.

225. As a result, the 2026 Dismantling Proclamation violates the Act and is unlawful.

**SECOND CLAIM FOR RELIEF**
**Violation of the U.S. Constitution and**
**the separation-of-powers doctrine**
***(All Defendants)***

226. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

227. The Constitution vests Congress with exclusive power over federal territory and property, and foreign and interstate commerce. U.S. Const. art. IV, § 3, cl. 2; *id.* art. I, § 8, cl. 3.

228. The President has the authority to regulate federal territory or the conduct of foreign and interstate commerce only to the extent that Congress has delegated that authority to the President.

229. Congress has not delegated authority to the President to revoke protections for the proper care and management of monument objects or to abolish a national monument reservation, in whole or in part.

230. The President has no independent authority to reduce or remove protections for a national monument.

231. The 2026 Dismantling Proclamation is in excess of the President's authority under Article II of the U.S. Constitution and intrudes on Congress's exclusive power under the Property and Commerce Clauses, in violation of the doctrine of separation of powers.

**THIRD CLAIM FOR RELIEF**
**Violation of the APA:**
**Final agency action not in accordance with the law**
***(Defendants Lutnick and Jacobs)***

232. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

233. The APA confers a right of action on any person adversely affected by a final agency action or a failure to act and waives the federal government's sovereign immunity. 5 U.S.C. §§ 702, 704.

234. Because President Trump had no lawful authority to revoke protections from the Monument, the Secretaries of Commerce and the Interior and their subordinate officers remain subject to the 2016 and 2021 Proclamations' direction that they "shall prohibit" commercial fishing in the Monument.

235. Defendants Lutnick and Jacobs have violated their duty to ensure NMFS's compliance with the 2016 Designating Proclamation by issuing the

Rescission Rule. The Rescission Rule purports to implement the unlawful 2026 Dismantling Proclamation, in violation of the Monument's designation.

236. The Rescission Rule is a final agency action subject to APA review. 5 U.S.C. § 704.

237. Defendants Lutnick's and Jacobs's implementation of the unlawful 2026 Dismantling Proclamation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A).

**FOURTH CLAIM FOR RELIEF**
**Violation of the APA and the Magnuson-Stevens Act:**
**Failure to conduct notice-and-comment rulemaking**
***(Defendants Lutnick and Jacobs)***

238. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

239. Defendants Lutnick and Jacobs are responsible for ensuring that NMFS complies with the Magnuson-Stevens Act and the APA. The Magnuson-Stevens Act requires all regulations under that Act promulgated by NMFS to follow the APA's notice-and-comment procedures. 16 U.S.C. § 1855(d).

240. Judicial review of the agency's compliance with the Magnuson-Stevens Act and the APA is appropriate pursuant to 5 U.S.C. §§ 702, 704 and 16 U.S.C. § 1855(f)(1).

241. In 2024, NMFS codified a final rule, following notice and comment, prohibiting all commercial fishing within the Monument. *See* 89 Fed. Reg. at 12282.

242. Following the issuance of the 2024 Fishing Prohibition Rule, any commercial fishing in the Monument violated the Magnuson-Stevens Act, which makes it unlawful for any person "to violate . . . any regulation" issued pursuant to the Act. 16 U.S.C. § 1857(1)(A).

243. The Rescission Rule rescinded the regulation prohibiting commercial fishing in the Monument, formerly codified at 50 C.F.R. § 600.725(x).

244. The Rescission Rule is a final agency action and a rulemaking with the force and effect of law. It was required to comply with the APA's notice-and-comment procedures, 5 U.S.C. § 553.

245. In the Rescission Rule preamble, NMFS stated that public comment on this rule would be "impracticable, unnecessary, and contrary to the public interest," because "the removal of the prohibition on commercial fishing went into effect immediately upon issuance of the Proclamation," and it issued the rule to "conform to the [2026 Dismantling] Proclamation." 91 Fed. Reg. at 17159.

246. NMFS also stated that the Rescission Rule was "not discretionary, making the opportunity for prior public comment unnecessary," as the rule purported to simply "remove[] regulations that do not reflect current law." *Id.*

247. NMFS's only articulation of the public interest basis for skipping notice-and-comment was to "provide[] clarity and certainty to the fishing industry." *Id.*

248. NMFS's assessment that the agency's Rescission Rule was nondiscretionary, and therefore public comment was unnecessary, is incorrect. The

2026 Dismantling Proclamation found that "a prohibition on commercial fishing is not, at this time, necessary for the proper care and management of the [Monument] or the objects of historic or scientific interest therein," and that commercial fishing would not put the objects of historic and scientific interest at risk if it was "appropriately managed." 91 Fed. Reg. at 6489-90.

249. Even if the 2026 Dismantling Proclamation was lawful (it is not), NMFS violated its duty under the APA and the Magnuson-Stevens Act to solicit public comment to help determine what kind of "*appropriately managed commercial fishing*" is required to prevent putting "the objects of historic and scientific interest that the monument protects at risk" and to comply with the other applicable laws, including the ten statutes cited in the Proclamation as guiding the agencies' management of fishing in the Monument. *See id.* (emphasis added).

250. NMFS retains significant discretion to regulate commercial fishing within the Monument. For example, NMFS could prohibit commercial fishing in parts of the Monument, or consider other types of restrictions, such as catch limits, seasonal restrictions, or prohibitions on certain types of fishing gear.

251. NMFS's failure to engage in notice-and-comment rulemaking violated 5 U.S.C. § 553 and 16 U.S.C. § 1855(d).

252. Because NMFS did not have good cause to forego notice and comment, the Rescission Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and done "without observance of procedure required by law," *id.* § 706(2)(D).

**FIFTH CLAIM FOR RELIEF**
**Violation of the APA and the Magnuson-Stevens Act:**
**Failure to engage in reasoned decision-making**
***(Defendants Lutnick and Jacobs)***

253. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

254. The Magnuson-Stevens Act allows judicial review of any regulation promulgated by NMFS under the standards of the APA if a petition is filed within 30 days of the regulation's promulgation or publication in the Federal Register. 16 U.S.C. § 1855(f). The APA confers a right of action on any person adversely affected by a final agency action or a failure to act and waives the federal government's sovereign immunity. 5 U.S.C. §§ 702, 704.

255. The 2026 Dismantling Proclamation declared that "*appropriately managed* commercial fishing would not put the objects of historic and scientific interest that the monument protects at risk." 91 Fed. Reg. at 6489 (emphasis added). NMFS "failed to consider an important aspect of the problem" when it (1) did not acknowledge that the Act required its management decisions to be compatible with the "proper care and management of the objects" of historic or scientific interest, 54 U.S.C. § 320301(b), and (2) did not seek to identify what "appropriately managed" fishing that could protect the Monument's objects might be, 91 Fed. Reg. at 6489. Nowhere in the Rescission Rule did NMFS explain how reverting to the default regulatory regime would be adequate to protect the objects of historic or scientific interest or would be the best choice to satisfy the agency's obligations under other relevant statutes.

256. Even if the 2026 Dismantling Proclamation was lawful (it is not), Defendants' unreasoned decision-making was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. 5 U.S.C. § 706(2)(A).

**SIXTH CLAIM FOR RELIEF**
**Violation of NEPA and the APA:**
**Failure to conduct NEPA analysis**
***(Defendants Lutnick and Jacobs)***

257. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

258. The Rescission Rule rescinds a previous regulation banning commercial fishing in the Monument, thereby allowing commercial fishing to occur within the Monument boundaries.

259. The effect of the Rescission Rule was to adopt the regulations and management measures effective for the geographic area of the Monument absent the protections put in place by the Monument designation and the prior commercial fishing prohibition regulation.

260. NMFS issued the Rescission Rule without conducting any NEPA analysis. NMFS did not rely upon a categorical exclusion or produce an EA or EIS.

261. NMFS did not address whether the Rescission Rule was a major Federal action significantly affecting the quality of the human environment.

262. NMFS gave one reason for not complying with the requirements of NEPA in the Rescission Rule. It asserted that NEPA did not apply to the rule because it "merely conforms the Magnuson-Stevens Act regulations to applicable

law under the [2026 Dismantling Proclamation]" and NMFS therefore had "no discretion." 91 Fed. Reg. at 17159-60.

263. The Rescission Rule is a major Federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(C).

264. NMFS has discretion to regulate commercial fishing in the Monument, pursuant to the Magnuson-Stevens Act and other statutory authorities.

265. Even if the 2026 Dismantling Proclamation was lawful (it is not), the 2026 Dismantling Proclamation leaves NMFS with discretion in deciding how to regulate commercial fishing in the Monument, and NEPA requires NMFS to consider a reasonable range of alternatives and the reasonably foreseeable environmental impacts of exercising that discretion.

266. NMFS's failure to produce an EIS, an EA, a FONSI, or any other NEPA analysis in connection with the Rescission Rule violates NEPA and renders the Rescission Rule "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," under the APA, 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs request that the Court:

1. Declare that President Trump's proclamation of February 6, 2026, is *ultra vires*, invalid, and void ab initio;

2. Declare that President Trump's proclamation of February 6, 2026, exceeds the President's authority under Article II of the U.S. Constitution, violates the separation-of-powers doctrine, and is invalid and void ab initio;

3. Declare that the Rescission Rule is arbitrary and capricious and contrary to law;

4. Declare that NMFS violated the APA and the Magnuson-Stevens Act by issuing the Rescission Rule without notice-and-comment rulemaking, without good cause;

5. Declare that NMFS violated the APA by failing to engage in the required NEPA analysis prior to issuing the Rescission Rule;

6. Vacate the Rescission Rule;

7. Issue injunctive relief against the Agency Defendants directing them to carry out their mandatory duties imposed in the 2016 Proclamation and enjoining them from carrying out President Trump's proclamation of February 6, 2026;

8. Award Plaintiffs fees and costs pursuant to 28 U.S.C. § 2412; and

9. Grant such other relief as the Court deems just and proper.

Dated: August 27, 2026

Respectfully submitted,

/s/ Jacqueline M. Iwata
Jacqueline M. Iwata (D.C. Bar No. 1047984)
Sarah C. Tallman (D.C. Bar No. 90007435)
Natural Resources Defense Council
1152 15th Street, NW Suite 300
Washington, DC 20005
(202) 289-6868
jiwata@nrdc.org
stallman@nrdc.org

Jennifer A. Friedmann* (*pro hac vice*)
Natural Resources Defense Council
20 N. Wacker Dr., Suite 1600
Chicago, IL 60606

(312) 847-6827
jfriedmann@nrdc.org
**Admitted to practice law in California*

*Counsel for Plaintiff Natural Resources Defense Council*

/s/ Erica A. Fuller
Erica A. Fuller (D.D.C. Bar. ID MA001)
Chloe C. Fross (D.D.C. Bar ID MA0048)
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
(617) 850-1727
efuller@clf.org
cfross@clf.org

*Counsel for Plaintiff Conservation Law Foundation*

/s/ Kristen Monsell
Kristen Monsell (D.D.C. Bar ID CA00060)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7137
kmonsell@biologicaldiversity.org

*Counsel for Plaintiffs Klyver & Center for Biological Diversity*